Notice: This opinion is subject to formal revision before publication in the Federal Reporter or U.S.App.D.C. Reports. Users are requested to notify the Clerk of any formal errors in order that corrections may be made before the bound volumes go to press.

# United States Court of Appeals

FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued October 17, 2003      Decided November 21, 2003

Nos. 02–1208, 02–1269

SIOUX VALLEY RURAL TELEVISION, INC., ET AL.,
PETITIONERS,

v.

FEDERAL COMMUNICATIONS COMMISSION AND
UNITED STATES OF AMERICA,
RESPONDENTS.

———

On Petitions for Review of an Order of the
Federal Communications Commission

———

*Richard S. Myers* argued the cause for petitioners.

*Stewart A. Block*, Counsel, Federal Communications Commission ("FCC"), argued the cause for respondents. With him on the brief were *Jane E. Mago*, General Counsel, FCC, and *John E. Ingle*, Deputy Associate General Counsel, FCC, *R. Hewitt Pate*, Acting Assistant Attorney General, U.S.

Bills of costs must be filed within 14 days after entry of judgment. The court looks with disfavor upon motions to file bills of costs out of time.

Department of Justice, and *Robert B. Nicholson* and *Robert Wiggers*, Attorneys, U.S. Department of Justice.

Before: HENDERSON, TATEL, and ROBERTS, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* ROBERTS.

ROBERTS, *Circuit Judge*: On July 28 and 29, 1994, the Federal Communications Commission auctioned licenses for a slender band of spectrum known as the Interactive Video and Data Services (IVDS) spectrum (Auction No. 2). The IVDS spectrum consists of two 500 kilohertz channels — 218.0–218.5 MHz and 218.5–219.0 MHz — and Auction No. 2 distributed one license for each channel in 297 Metropolitan Statistical Areas (MSAs) — a total of 594 licenses. The petitioners were among Auction No. 2's 178 winning bidders.

Petitioners seek review of a final order of the FCC that: (1) eliminated a 25 percent bidding credit for businesses owned by women or members of racial minorities; (2) established and retroactively applied a substantially similar bidding credit to licensees that qualified as small businesses; and (3) offered various options for licensees to restructure their outstanding financial obligations to the Commission. *See In re Amendment of Part 95 of the Commission's Rules to Provide Regulatory Flexibility in the 218–219 MHz Service*, 15 F.C.C.R. 1497 (1999) (*Restructuring Order*). Petitioners contend that the *Restructuring Order* unlawfully limited the bidding credit to small business licensees. Petitioner Celtronix also argues that the Commission arbitrarily rejected Celtronix's proposed restructuring options. We conclude that the *Restructuring Order* was a lawful and reasonable exercise of the Commission's authority over spectrum auctions, and accordingly deny the petitions for review.

## I.

The Omnibus Budget Reconciliation Act of 1993, Pub. L. No. 103–66, 107 Stat. 312, amended the Communications Act to require the Commission to distribute spectrum licenses "through a system of competitive bidding." *See id.* at

§ 6002(a), 107 Stat. 388 (codified as amended at 47 U.S.C. § 309(j)(1)). Congress further required that the Commission, in designing competitive bidding processes, "ensure that small businesses, rural telephone companies, and businesses owned by members of minority groups and women are given the opportunity to participate in the provision of spectrum-based services, and, for such purposes, consider the use of . . . bidding preferences. . . ." *Id.*, 107 Stat. 389 (codified at 47 U.S.C. § 309(j)(4)(D)). Responding to this mandate, the Commission established — for Auction No. 2 — a 25 percent bidding credit for businesses owned by women or minorities[1] that could be applied to one license in each MSA. *See In re Implementation of Section 309(j) of the Communications Act — Competitive Bidding*, 9 F.C.C.R. 2330, 2336 ¶ 36 (1994) (*Auction No. 2 Rules*); 47 C.F.R. § 95.816(d)(1) (1994).[2] The bidding credit operated to reduce the amount a winning bidder owed the Commission by 25 percent.

The Commission also sought to assist small businesses by allowing winning small business bidders[3] to make a 20 percent down payment and to pay the remaining 80 percent in installments over the five-year term of the license. *See Auction No. 2 Rules*, 9 F.C.C.R. at 2336 ¶ 36; 47 C.F.R. § 95.816(d)(3) (1994). Small businesses owned by women or

---

[1] To qualify, women or minorities had to own and control at least 50.1 percent of outstanding shares and voting rights. *See* 47 C.F.R. § 1.2110(b)(2) (1994).

[2] Under the procedures established by the Commission, the two IVDS licenses in each market were auctioned simultaneously. The two highest bidders were then awarded the two licenses, with the high bidder given its choice of channels. *See Auction No. 2 Rules*, 9 F.C.C.R. at 2332 ¶ 13. Because the minority/female bidding credit was available only for one license in each MSA, if both winning bidders were owned by women or minorities, only the high bidder received the bidding credit. *Id.* at 2336 ¶ 39 & n.65.

[3] To qualify as a small business, the entity had to have less than $6 million net worth and $2 million annual net profit each of the previous two years. *See Implementation of Competitive Bidding*, 59 Fed. Reg. 22,980–01, 22,989 (May 4, 1994) (amending 47 C.F.R. § 1.2110(b)(1)).

minorities were allowed to take advantage of both the minority/female bidding credit and the installment payment plan. *See Auction No. 2 Rules*, 9 F.C.C.R. at 2337–39 ¶¶ 43–47, 53–54; FCC Auction No. 2 Bidder Information Package — Procedures, Terms and Conditions 10, *available at* http://wireless.fcc.gov/auctions/02/releases/2_Procedures.pdf (last visited Nov. 21, 2003).

Of the 178 winning bidders, 164 qualified as small businesses; those small businesses won 557 of the 594 available licenses. *See* FCC Auction No. 2 Results, *available at* http://wireless.fcc.gov/auctions/02/charts/2market.xls (last visited Nov. 21, 2003). One hundred and four winning bidders qualified for the minority/female bidding credit and those businesses accumulated 291 licenses — nearly half of the available total. *Id.* Every winning bidder who qualified for the minority/female bidding credit also qualified for the small business installment payment option. *See Restructuring Order*, 15 F.C.C.R. at 1534 ¶ 61. The Auction No. 2 experiences of certain petitioners illustrate the operation of the different payment options:

1. Sioux Valley Rural Television was the high bidder in the Rapid City, South Dakota MSA with a bid of $27,000. *See* FCC Auction No. 2 Results. Because it was neither a small business nor owned by women or minorities, Sioux Valley could not employ either the minority/female bidding credit or the installment payment option. The next high bidder in the market, Media Ventures, bid $26,000 and was awarded the second license. *Id.* Media Ventures, however, satisfied the minority/female ownership and small business requirements, and so the Commission reduced Media Ventures's obligation by 25 percent — to $19,500 — and allowed it to pay that amount on a five-year installment plan. *Id.*

2. Having bid $200,000, Self Communications, Inc. was the second-highest bidder for the Gary, Indiana MSA. *Id.* Like Sioux Valley, Self Communications was not minority- or female-owned and did not qualify as a small business, and therefore it owed the full amount of its bid upon receipt of the license. *Id.* By contrast, the high bidder for the market,

Skytouch Communications, Inc. ($225,000), received a minority/female bidding credit, and thus owed the Commission only $168,750 for the license — an amount which Skytouch, as a small business, was allowed to pay in installments. *Id.*

3. Celtronix Telemetry (then doing business as Community Teleplay, Inc.) was the second-highest bidder for the Norfolk, Virginia market, having offered $850,000. *Id.* While Celtronix did not receive the benefit of a minority/female bidding credit, as a small business it was permitted to make a 20 percent down payment ($170,000) and to pay the remaining 80 percent of its bid ($680,000) in installments over the five-year term of the license. *Id.*

\* \* \*

After the results of Auction No. 2 were announced, another winning bidder, Graceba Total Communications, Inc., petitioned the Commission for reconsideration, arguing that the Commission's auction procedures had artificially inflated the prices of the IVDS licenses. While that petition was pending before the Commission, the Supreme Court decided *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200 (1995), and held that racial classifications in federal government contracts were subject to strict scrutiny. *Id.* at 235. The following term, the Court held that gender-based classifications in government programs must be justified by an "exceedingly persuasive justification." *United States v. Virginia*, 518 U.S. 515, 531 (1996) (*VMI*). Immediately after *Adarand*, Graceba filed a second petition for reconsideration arguing that the Commission's minority/female bidding credit was unconstitutional and requesting that the Commission grant it the same 25 percent bidding credit. *See Restructuring Order*, 15 F.C.C.R. at 1503 ¶ 9.

Finding that Graceba's constitutional argument had not been timely raised, the Commission denied both of Graceba's petitions. *See In re Interactive Video & Data Service (IVDS) Licenses — Various Requests by Auction Winners*, 11 F.C.C.R. 1282, 1285 ¶ 23 (1995). On Graceba's petition for review, we vacated that order and remanded for consideration

of Graceba's constitutional arguments. *Graceba Total Com-munications, Inc. v. FCC*, 115 F.3d 1038, 1041–42 (D.C. Cir. 1997). In so doing, we noted that Graceba's case raised not only constitutional arguments, but also "fact-specific, policy-laden concerns" such as "questions about the finality of FCC licenses, [and] fairness to auction participants," resolution of which "would benefit from the agency's expertise." *Id.* at 1042.

Meanwhile, the IVDS spectrum was turning out to be an idea whose time had not yet come. The function initially envisioned for the spectrum — interactive television — was no longer seen as a commercially viable enterprise. *See Restructuring Order*, 15 F.C.C.R. at 1506 ¶ 13. In 1996, less than two years after Auction No. 2, a coalition of IVDS licensees sought relief from their financial obligations to the Commission, including an extension of the license term (and a concomitant extension of the installment payment amortiza-tion schedule) from five to ten years, along with grace periods from payments. *See In re Amendment of Part 95 of the Commission's Rules to Provide Regulatory Flexibility in the 218–219 MHz Service*, 13 F.C.C.R. 19,064, 19,081 ¶¶ 28–29 (1998). In response, the Commission effectively suspended payment obligations for licensees not already in default, *id.* at 19,072–73 ¶¶ 12–13, and issued a notice of proposed rulemak-ing to examine possibilities for restructuring the licensees' financial obligations to the Commission, *id.* at 19,080–96 ¶¶ 28–57. At that time, the Commission also dropped the IVDS moniker and eponymously renamed the sliver of spec-trum the "218–219 MHz Service." *Id.* at 19,075 ¶ 16. The name change, however, could not disguise the fact that "the deployment of the 218–219 MHz Service had not been suc-cessful. . . . [W]ith a few, limited exceptions, licensees had still been unable to offer services." *Restructuring Order*, 15 F.C.C.R. at 1505 ¶ 13.

*The Restructuring Order*

Responding to both the continuing dormancy of the 218–219 MHz spectrum and this court's *Graceba* remand, the Commission released its *Restructuring Order* in September

1999. *See* 15 F.C.C.R. at 1497. In the *Restructuring Order*, the Commission took several steps to mitigate the financial distress of the 218–219 MHz small business licensees with outstanding installment payment obligations to the Commission. First, the Commission extended the term of the 218–219 MHz licenses from five to ten years. *See id.* at 1517 ¶ 31. The Commission also provided those small business licensees not then in default with three options to restructure their installment payments to the Commission — resumption, amnesty, or prepayment. *See id.* at 1518–29 ¶¶ 33–54. Under the "resumption" option, the licensee would resume installment payments, reamortized over the new ten-year license term. *See id.* at 1522–25 ¶¶ 40–45. The "amnesty" option allowed a licensee to return to the Commission one or more of the licenses it had been awarded. In return, the Commission would extinguish any debt associated with that license and refund any installment payments previously made, except for the 20 percent down payment. *See id.* at 1525–27 ¶¶ 46–50. Finally, under the "prepayment" option, a licensee could retain a license by paying in full the outstanding balance on that license, using — as part of the prepayment — 85 percent of the down payments on licenses surrendered under the amnesty option. *See id.* at 1528–29 ¶¶ 51–53.

The Commission also restructured its bidding credit system in response to this court's remand in *Graceba* and comments from numerous licensees arguing that the minority/female bidding credit ran afoul of the Supreme Court's recent decisions in *Adarand* and *VMI*. *See id.* at 1531–32 ¶¶ 57, 59. The commenting licensees — not minority- or female-owned — argued that they, too, were entitled to a 25 percent bidding credit, retroactively applied. *See id.* at 1532 ¶ 59. In its *Restructuring Order*, the Commission acknowledged that the administrative record on ownership of telecommunications facilities "would not adequately support the race- and gender-based provisions of the . . . competitive bidding rules under a strict scrutiny standard." *Id.* at 1533 ¶ 60. The Commission thus sought to craft a "remedy responsive to [the] commenters." *Id.*

The Commission decided to "eliminate from our rules the minority- and women-owned business bidding credits and . . . simultaneously grant credits of commensurate size to all winning small business bidders in [Auction No. 2]." *Id.* This new 25 percent bidding credit for small businesses was called the "Remedial Bidding Credit" (RBC). *Id.* at 1533 ¶ 61. The Commission noted that while it had revoked the bidding credit previously given to minority- and female-owned businesses, those businesses would suffer "no known negative impact . . . because all such bidders also met the small business qualifications," and therefore would be awarded the substantially identical RBC. *Id.* at 1534 ¶ 61. The Commission concluded that this course — eliminating the unconstitutional bidding credit, then establishing a similar but race- and gender-neutral credit — "strikes a proper balance" between the need to cure the bidding credit system of constitutional defects, on the one hand, and auction policy concerns such as "the need to avoid any major disruptions to the operations of existing 218–219 MHz Service providers," "the importance of finality as a principle in the granting of licenses," and "fairness to auction participants," on the other. *Id.* at 1534 ¶ 63.

*Petitions for Reconsideration*

Several licensees (including some of the petitioners here) — calling themselves the Ad Hoc Coalition (the Coalition) — sought reconsideration of the *Restructuring Order*, alleging that the Commission's expressed desire that the RBC have no "negative impact" on recipients of the earlier minority/female bidding credit evinced an unconstitutional motive to perpetuate a race- and gender-based preference. The petitioning licensees demanded that the 25 percent bidding credit be extended to all 218–219 MHz licensees, regardless of size.

Celtronix filed a separate petition for reconsideration challenging the *Restructuring Order*'s installment payment restructuring options. Celtronix asked the Commission to add a fourth restructuring option — disaggregation — whereby a licensee could divide a 500 kHz license in half, retaining a license for 250 kHz, while surrendering the other half. Under this proposal, the licensee's down payment on the surren-

dered portion of the spectrum, rather than being forfeited to the Commission, would be credited to pay down the obligation on the retained portion. Celtronix also asked that the Commission refund down payments to licensees who select the amnesty option, arguing that the Commission's policy of retaining the down payments was arbitrarily inconsistent with the policy of allowing licensees selecting the prepayment option to allocate 85 percent of the down payments on their surrendered licenses to outstanding obligations on retained licenses.

The Commission rejected the arguments of the Coalition and Celtronix. *See In re Amendment of Part 95 of the Commission's Rules to Provide Regulatory Flexibility in the 218–219 MHz Service*, 15 F.C.C.R. 25,020 (2000) (*Second Order on Reconsideration*).[4] The Commission concluded that the facially neutral RBC did not implicate either *Adarand* or *VMI*, and was not otherwise motivated by unlawful discrimination. *Id.* at 25,038–42 ¶¶ 40–47. The Commission observed that petitioners' constitutional arguments were premised on the incorrect notion that the RBC was implemented to remedy race and gender discrimination in Auction No. 2. *Id.* at 25,041 ¶ 44. The Commission emphasized that the restructuring of the bidding credit regime was, in reality, a two-step process: First, to ameliorate the constitutional concerns raised in the *Graceba* remand, the Commission eliminated the minority/female bidding credit. Then, because the elimination of that bidding credit (the equivalent of an abrupt 33 percent price hike) would cause severe disruption among the 104 licensees who had enjoyed the credit, the Commission chose to "afford all small businesses an after the fact bidding credit." *Id.* In effect, the Commission "leveled the [minority/female] bidding credit benefit upward" to include all small businesses. *Id.* The RBC "fulfilled [the FCC's] statutory

---

[4] The Commission had released its *First Order on Reconsideration* more than a year earlier, *sua sponte*, in order to correct an error — not relevant to these proceedings — in the *Restructuring Order*'s discussion of the amnesty option. *See In re Amendment of Part 95 of the Commission's Rules to Provide Regulatory Flexibility in the 218–219 MHz Service*, 14 F.C.C.R. 21,078 (1999).

mandate of encouraging participation of entrepreneurs, rural telephone companies, and businesses owned by members of minority groups and women," and "solved a multi-faceted and complex set of regulatory issues." *Id.* The Commission thus rejected the petitioners' demand that the credit be extended to cover all winning bidders regardless of size. *Id.*

The Commission also rejected Celtronix's "disaggregation" proposal. *See id.* at 25,028–29 ¶¶ 17–20. While the Commission acknowledged that Celtronix would be able to provide service on a disaggregated 250 kHz block of spectrum, other licensees had expressed doubt that "channel blocks smaller than 500 kHz are practical for innovative uses." *Id.* at 25,029 ¶ 19. The Commission also took note of the claim of several licensees that the existing 500 kHz blocks were themselves too small for commercially viable services. *Id.* at 25,029 ¶ 18. These comments led the Commission to doubt "that service will be developed in the portion of a channel block that would remain after a licensee elects disaggregation as a restructuring option," or that the market otherwise "would support the auction of disaggregated spectrum blocks in the 218–219 MHz Service." *Id.* at 25,029 ¶¶ 19–20.

Finally, the Commission declined to adopt Celtronix's proposal that licensees selecting the amnesty restructuring option be refunded their down payments. The Commission noted that allowing down payments on surrendered licenses to be allocated to retained licenses under the prepayment option served "the public interest benefit of speeding service to the public." *Id.* at 25,030 ¶ 23. The Commission found no "adequate counterbalancing public interest benefit" to Celtronix's refund proposal, concluding instead that Celtronix's proposal "would undermine the integrity of the auction process by relieving participants of even the most basic obligation of their participation." *Id.*

The Coalition filed a second petition for reconsideration, reprising its arguments that the RBC maintained the unconstitutional race and gender preferences animating the earlier minority/female bidding credit. The Coalition also launched a new attack on the RBC, arguing that it violated the notice-

and-comment provisions of the Administrative Procedure Act, 5 U.S.C. § 553(b)(3), (c). In its *Third Order on Reconsideration*, the Commission rejected these arguments. *See In re Amendment of Part 95 of the Commission's Rules to Provide Regulatory Flexibility in the 218–219 MHz Service*, 17 F.C.C.R. 8520, 8525–28 ¶¶ 14–20 (2002) (*Third Order on Reconsideration*). The Commission dismissed as repetitious the Coalition's arguments concerning the constitutionality of the RBC. *See id.* at 8525–26 ¶¶ 15–17. As for the Coalition's notice-and-comment argument, the Commission concluded that it had not been made with sufficient particularity in the Coalition's first petition for reconsideration to merit the Commission's attention at that time, and was accordingly untimely when presented in the second petition. *Id.* at 8526 ¶ 18. Finding that no public interest would be served by the review of the Coalition's untimely argument, the Commission dismissed it as well. *Id.* at 8527–28 ¶ 20.

Petitioners timely filed petitions for review of the Commission's *Restructuring Order*, and they were consolidated for purposes of appeal.

## II.

Under the Administrative Procedure Act, our review of agency action is highly deferential; we will affirm agency action unless it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Under this highly deferential standard, we do not "substitute [our] judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Rather, we will leave an agency decision undisturbed as long as it "examine[s] the relevant data and articulate[s] a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Id.* (quoting *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962)).

The arguments raised in the petitions for review fall into two broad categories: challenges to the lawfulness of the

RBC and Celtronix's challenges to the restructuring options offered by the Commission. We will address each in turn.

## A.

*Remedial Bidding Credit*

Petitioners level two main charges at the RBC: first, that the RBC's limitation to small businesses is unconstitutional and is otherwise arbitrary and capricious; and second, that the Commission's adoption of the RBC in the *Restructuring Order* violated the notice-and-comment requirements of the APA. We conclude that both contentions are meritless.

### 1. Lawfulness of Remedial Bidding Credit

Petitioners claim that the Commission acted unlawfully when it limited the RBC to small businesses and rejected petitioners' proposal that the RBC be extended to all winning bidders regardless of size. Petitioners make three independent sub-arguments in support of this conclusion.

### a. Discriminatory Intent

Petitioners maintain that the RBC, its facial neutrality notwithstanding, was impermissibly motivated by considerations of race and gender discrimination and thus is unconstitutional. In *Hunt v. Cromartie*, 526 U.S. 541 (1999), the Supreme Court held that strict scrutiny could be applied to a facially neutral law, but "only if it can be proved that the law was motivated by a racial purpose or object, or if it is unexplainable on grounds other than race." *Id.* at 546 (internal quotation marks and citations omitted). To discern the intent underlying an agency action, we look to "the historical background of the decision," "the specific sequence of events leading up to the challenged decision," and any "departures from the normal procedural sequence." *Omnipoint Corp. v. FCC*, 78 F.3d 620, 634 (D.C. Cir. 1996) (quoting *Arlington Heights v. Metropolitan Hous. Dev. Corp.*, 429 U.S. 252, 265 (1997) (internal quotation marks and alterations omitted)).

To support their allegation that the RBC is merely a continuation of the unconstitutional minority/female bidding

credit, petitioners point to the Commission's observation that the RBC would not negatively impact recipients of the minority/female bidding credit, because all of them also qualified as small businesses. *See Restructuring Order*, 15 F.C.C.R. at 1534 ¶ 61. Petitioners argue that this statement demonstrates that the Commission was actually concerned with perpetuating race- and gender-based preferences, rather than assisting small businesses. We rejected a substantially identical argument in the context of another FCC spectrum auction, stating that the Commission's consideration of "the effect a rule change would have on minority- and women-owned businesses does not evince its discriminatory intent." *Omnipoint*, 78 F.3d at 634. That would seem to go some distance toward foreclosing petitioners' claim of discriminatory intent here.

Petitioners nevertheless attempt to distinguish our *Omnipoint* decision on the basis that the *Restructuring Order* applied the RBC retroactively whereas, in *Omnipoint*, the change in bidding credit rules occurred before the auction had taken place. This, say petitioners, demonstrates that the RBC — unlike the bidding credit in *Omnipoint* — could not have been motivated by the congressional mandate to encourage participation of small businesses in spectrum auctions; not even the FCC could, in 1999, have encouraged participation in an auction that had occurred in 1994. Supposedly having put the lie to the Commission's stated purpose, petitioners maintain that the RBC is unexplainable on any ground other than race. We disagree.

First, Congress did not require only that the Commission encourage small business *participation* in spectrum *auctions*. *See* 47 U.S.C. § 309(j)(4)(D). Congress also charged the Commission with the mandate of "*disseminating licenses* among a wide variety of applicants, including small businesses." *Id.* at § 309(j)(3)(B) (emphasis added). While the petitioners are surely correct that the RBC could not, five years after the fact, possibly encourage participation in Auction No. 2, it certainly could (and did) encourage the *dissemination* of licenses to small businesses by lowering the financial burden on those favored licensees. In any event, the RBC is readily explainable on other race-neutral grounds,

including "finality as a principle in the granting of licenses," "fairness to auction participants" who had in good faith relied upon the existence of the bidding credit in constructing their business models, and the need "to avoid major disruptions to the affected service." *See Restructuring Order*, 15 F.C.C.R. at 1534–35 ¶ 63. Similarly, the Commission's decision to limit the RBC to small businesses is explainable on the race-neutral ground that the Commission (quite naturally) wanted, consistent with the Commission's other statutorily defined objectives, to retain as much of the proceeds from Auction No. 2 as possible. *See* 47 U.S.C. § 309(j)(3)(C) (directing the Commission to "recover[ ] for the public . . . a portion of the value of the public spectrum resource"). By contrast, other than the Commission's observation of the effects of the *Restructuring Order* on recipients of the minority/female bidding credit, petitioners have put forth no evidence to indicate that the RBC was intended to manifest racial or gender preferences. Petitioners have thus failed to meet their burden of showing that the RBC was motivated by a racial purpose or is unexplainable except on the basis of race.

*b. Constitutionally Insufficient Remedy*

Petitioners next argue that the RBC is a "Constitutionally Insufficient Remedy" (Pet. Br. 23) for the race and gender discrimination that infected Auction No. 2. Specifically, petitioners claim that the RBC is inadequate because it fails to account for the time value of money lost to white-male-owned small business licensees for the period between Auction No. 2 and the payment of the RBC refunds. Petitioners assert that to pass constitutional muster, a remedy "must be designed as nearly as possible 'to restore the victims of discriminatory conduct to the position they would have occupied in the absence of such conduct.' " *Milliken v. Bradley*, 433 U.S. 267, 280 (1977) (quoting *Milliken v. Bradley*, 418 U.S. 717, 746 (1974)). From that case (which concerned a federal court's school desegregation order) petitioners reason that the Commission must pay interest to those licensees who benefitted from the RBC but not the original minority/female bidding credit.

This argument also fails. First, we are precluded from reviewing any claim for the payment of interest because petitioners failed to present this demand to the Commission in a petition for reconsideration. *See* 47 U.S.C. § 405; *AT&T Corp. v. FCC*, 317 F.3d 227, 235 (D.C. Cir. 2002) (court lacks jurisdiction to review an argument not previously presented to Commission).[5]

Second, petitioners' focus on the RBC is misplaced; to the extent that they construe the RBC as a remedy for discrimination in Auction No. 2, they err. The Commission's remedy for the unlawful discrimination was simply to "eliminate from [its] rules the minority- and women-owned business bidding credits." *Restructuring Order*, 15 F.C.C.R. at 1533 ¶ 60. It was only after the Commission had eliminated those credits that it established the race- and gender-neutral RBC, crafted not to remedy discrimination but rather to address the "multi-faceted and complex set of regulatory issues" created by the elimination of the minority/female bidding credit, *Second Order on Reconsideration*, 15 F.C.C.R. at 25,041 ¶ 44. Once the Commission had eliminated the minority/female bidding credit, every Auction No. 2 licensee owed the full amount of its winning bid. At that time, petitioners occupied precisely the position (relative to favored minority- and female-owned licensees) they would have occupied absent the discriminatory

---

[5] Petitioners argue that their demand for interest was fairly presented in the Coalition's second petition for reconsideration. We cannot agree. Nowhere in that petition does the Coalition mention interest, let alone specifically demand that interest be paid. *See* Second Petition for Reconsideration of Ad Hoc Coalition, at 9 ("[L]icensees that received the race/gender credit in the 1994 auction . . . received that credit and the benefits thereof over 6 years before the non-preferred class of winning licensees in the same auction. The non-preferred class, unlike the preferred class, has not had the use of the money represented by the RBC for over 6 years. As adopted, the RBC continues to discriminate . . . ."). Such an "incomplete" presentation of an issue does not suffice to place a matter before the Commission such that it has been "afforded a fair opportunity" to pass on the argument. *Time Warner Entm't Co. v. FCC*, 144 F.3d 75, 79 (D.C. Cir. 1998).

conduct — owing 100% of their winning bids. The Commission thus adequately remedied the unconstitutional discrimination in Auction No. 2.

*c.  Arbitrary and Capricious Agency Action*

Leaving the realm of constitutional law, petitioners argue that the Commission's decision to limit the RBC to small business licensees is arbitrary and capricious. The Commission's obvious answer to this charge was that "Congress ha[d] not directed [the Commission] to take special steps to ensure the participation of large companies," *id.*; the relevant portions of the Communications Act express a preference for *small* businesses. *See id.*; 47 U.S.C. § 309(j)(3)(B). Petitioners advance two counter-arguments, each seeking to undermine the notion that the RBC actually is intended to serve the congressional objective of assisting small business to obtain spectrum licenses.

First, petitioners argue that the retroactive application of the RBC could not possibly encourage small businesses to participate in Auction No. 2, held in 1994. As discussed above, though, the RBC did encourage the dissemination of licenses to small businesses by easing the financial burdens on those entities and this directly serves the objective set out by Congress. *See id.*

Petitioners next contend that because the RBC applied to licensees who surrendered their licenses under the amnesty option, the RBC could not truly have been concerned with disseminating spectrum licenses to small businesses. Even assuming that this lack of narrow tailoring could be sufficient to strike the RBC, this argument seems to be based on a mistaken premise. The Commission did not award a bidding credit to licensees *after* they had surrendered their licenses. Licensees were not required to select a restructuring option until February 29, 2000 — more than five months after the release of the *Restructuring Order. See Restructuring Order*, 15 F.C.C.R. at 1529 n.178.[6]  Small business licensees

---

[6] The *Restructuring Order* specifies that the deadline for election of a restructuring option was the last day of the third month

thus had several months after receipt of their RBC to consider whether to retain a license under the resumption or prepayment restructuring options or to surrender the license under the amnesty option. While some RBC recipients did eventually decide to call it a day and surrender their licenses under the amnesty option (including petitioner Celtronix), providing the RBC to all small business licensees gave each the best opportunity to survive and to provide service to the public. Because the RBC is thus rationally connected to the congressional objective of disseminating licenses to small businesses, we have little difficulty affirming the Commission's decision to limit the application of the RBC to congressionally favored small business licensees.

### 2. *Notice-and-Comment Challenge*

Petitioners next maintain that the Commission failed to comply with the notice-and-comment requirements of the APA, 5 U.S.C. §§ 553(b)(3), (c), when it established the RBC in the *Restructuring Order*. *See Third Order on Reconsideration*, 17 F.C.C.R. at 8526–28 ¶¶ 18–20. We conclude that the Commission did not abuse its discretion in dismissing this challenge as untimely. *See id.*

The FCC's rules require that petitions for reconsideration be filed within 30 days of public notice of the action to be reconsidered, and provide that untimely petitions will not be considered except by leave of the Commission. *See* 47 C.F.R. § 1.429(d) (2000). The rules also require a petitioner to state with particularity the basis for reconsideration. *See id.* § 1.429(c). Here, the Coalition's timely first petition for reconsideration mentioned the notice-and-comment requirements of the APA only in passing. Opening their argument that the RBC failed to remedy the constitutional problems with the minority/female bidding credit, the Coalition wrote: "The FCC's conversion of the race/gender credit to a small business credit, aside from its dubious lawfulness under the

following the month in which the Restructuring Order was published in the Federal Register, November 1999. *See* 64 Fed. Reg. 59656–01 (Nov. 3, 1999) (publishing *Restructuring Order*).

Administrative Procedure Act (APA), which requires notice-and-comment proceedings for the adoption of new rules, does not resolve the constitutional issue." First Petition for Reconsideration of Ad Hoc Coalition, at 5. This ambiguous reference to "dubious lawfulness" does not amount to an argument stated with the particularity required by the Commission's rules. Innuendo *en passant* is not enough to catch the Commission's eye. We have held that the Commission "need not sift pleadings and documents to identify arguments that are not stated with clarity by a petitioner." *Bartholdi Cable Co. v. FCC*, 114 F.3d 274, 279 (D.C. Cir. 1997) (internal quotation marks and citation omitted). We see no reason to place a more onerous requirement on the Commission now.

While the Coalition did make the notice-and-comment argument in its second petition for reconsideration, the argument had not been raised to the Commission within 30 days of public notice of the *Restructuring Order*, and so that argument was untimely. The question thus becomes whether the Commission abused its discretion in refusing to grant the Coalition leave to raise the untimely argument.

The Coalition's second petition for reconsideration suggested no reason why the Commission ought to waive the untimeliness objection, and indeed did not even specifically request leave to file the untimely argument. On the other hand, the *Restructuring Order* plainly indicates that the Commission did consider comments from licensees (including petitioner Celtronix) concerning the minority/female bidding credit and how it ought to respond to this Court's *Graceba* remand. *See Restructuring Order*, 15 F.C.C.R. at 1532 ¶ 59 ("[T]his *Report and Order* addresses...comments and reply comments that raise...constitutional issues in this rulemaking."). Especially considering that disfavored licensees evidently had an adequate opportunity to comment on the minority/female bidding credit, and that the Commission actually responded to their comments, we can find no abuse of discretion in the Commission's refusal to grant the Coalition leave to make the untimely notice-and-comment argument. *See, e.g.*, *21st Century Telesis Joint Venture v. FCC*, 318 F.3d 192, 199–200 (D.C. Cir. 2003) (finding no abuse of discretion in the Commission's

decision to not address untimely claims made in a second petition for reconsideration when petitioner provided no explanation why the argument could not have been timely made).

**B.**

*Celtronix's Challenges to the Restructuring Options*

Celtronix contends that the Commission arbitrarily refused (1) to include Celtronix's disaggregation proposal among the allowed restructuring options;  and (2) to refund any portion of the down payment on licenses returned under the amnesty option.  These contentions, too, lack merit.

Celtronix argues that the Commission rejected its disaggregation proposal without considering evidence that commercially viable services could be provided on disaggregated 250 kHz blocks of spectrum.  This mischaracterizes the Commission's *Second Order on Reconsideration*.  There, the Commission acknowledged Celtronix's claim that it was able to provide service on just 250 kHz of spectrum.  *See Second Order on Reconsideration*, 15 F.C.C.R. at 25,028–29 ¶ 17. The Commission, however, was persuaded by other commenters who stated that even 500 kHz blocks might be too small to support the development of innovative services.  *See id.* at 25,029 ¶ 18.  This led the Commission to doubt whether the market would support a future auction of disaggregated 250 kHz blocks of spectrum surrendered by licensees.  *Id.* at 25,029 ¶¶ 19–20.  The Commission thus concluded that in the absence of a "substantial record demonstrating a broad-based need or desire" for 250 kHz blocks — a record Celtronix never compiled — Celtronix's proposal would not advance the public interest.  *Id.* at 25,029 ¶ 19.  We can find no fault with the Commission's decision;  the Commission considered the relevant evidence and made a policy judgment concerning the development of a nascent technology.  Such decisions are well within the purview of the responsible agency.  *See FCC v. National Citizens Comm. for Broad.*, 436 U.S. 775, 813 (1978) ("a forecast of the direction in which future public interest lies necessarily involves deductions based on the expert

knowledge of the agency" (quoting *FPC v. Transcon. Gas Pipe Line Corp.*, 365 U.S. 1, 29 (1961))); *Time Warner Entm't Co. v. FCC*, 240 F.3d 1126, 1133 (D.C. Cir. 2001) (Commission is entitled to "appropriate deference to predictive judgments that necessarily involve the expertise and experience of the agency").

Celtronix also claims that the Commission's decision to not refund down payments on licenses surrendered under the amnesty option is arbitrary and capricious when considered in light of its decision to allow, under the prepayment option, a licensee to apply 85 percent of a down payment on a surrendered license to the outstanding obligation on a retained license. We disagree. The Commission offered a cogent rationale for this policy choice. Unlike the prepayment option, the refund of down payments under the amnesty option would offer no "adequate counterbalancing public interest benefit." *Second Order on Reconsideration*, 15 F.C.C.R. at 25,030 ¶ 23. The Commission essentially would be relieving amnesty licensees of all of the obligations of auction participation *gratis*. By contrast, the Commission found that the refund of down payments under the prepayment option was justified by its tendency to promote the retention of licenses. The Commission concluded that license retention would redound to the public benefit because a current licensee could provide service to the public under the retained license more quickly than a new licensee who obtained the license at a future auction. *Id.* at 25,030–31 ¶ 23. We will not disturb the agency's policy judgment. The maxim that we must not substitute our judgment for that of the agency is "especially true when the agency is called upon to weigh the costs and benefits of alternative policies." *Center for Auto Safety v. Peck*, 751 F.2d 1336, 1342 (D.C. Cir. 1985) (Scalia, J.).

The petitions for review are denied.