# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

Argued May 11, 2006          Decided August 18, 2006

No. 05-1237

CHARTER COMMUNICATIONS, INC. AND
ADVANCE/NEWHOUSE COMMUNICATIONS,
PETITIONERS

v.

FEDERAL COMMUNICATIONS COMMISSION AND
UNITED STATES OF AMERICA,
RESPONDENTS

CONSUMER ELECTRONICS ASSOCIATION AND
NATIONAL CABLE & TELECOMMUNICATIONS ASSOCIATION,
INTERVENORS

---

On Petition for Review of an Order of the
Federal Communications Commission

---

*John D. Seiver* argued the cause for petitioners and intervenor National Cable and Telecommunications Association. With him on the briefs were *Paul Glist*, *Paul B. Hudson*, *Christopher A. Fedeli*, *Daniel L. Brenner*, and *Neal M. Goldberg*.

*Joseph R. Palmore*, Counsel, Federal Communications Commission, argued the cause for respondent. With him on the

brief were *Thomas O. Barnett*, Assistant Attorney General, U.S. Department of Justice, *Catherine G. O'Sullivan* and *Andrea Limmer*, Attorneys, *Samuel L. Feder*, General Counsel, Federal Communications Commission, *Richard K. Welch*, Associate General Counsel, *John E. Ingle*, Deputy Associate General Counsel, and *Laurence N. Bourne*, Counsel.

*Robert S. Schwartz* was on the brief for intervenor Consumer Electronics Association.

Before: GINSBURG, *Chief Judge*, and TATEL and GARLAND, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* GARLAND.

GARLAND, *Circuit Judge*: Cable television operators petition for review of an order of the Federal Communications Commission (FCC). In that order, the FCC declined to rescind a rule that will preclude cable operators from offering set-top converter boxes that bundle both security (descrambling) and non-security (e.g., channel selection) functions in a single device. For the reasons explained below, we deny the petition for review.

I

In the communications context, "navigation devices" are "equipment used by consumers . . . to access multichannel video programming and other services" from multichannel video programming distributors (MVPDs), such as cable operators and direct broadcast satellite services. 47 C.F.R. § 76.1200(c); *see id.* § 76.1200(b) (defining MVPDs). The most common such device is the set-top converter box. Cable television subscribers typically lease converter boxes from their cable operators as part of their overall service packages. As currently configured, these

devices integrate security and non-security functions. The security function "contain[s] embedded technology that decodes or descrambles" a cable signal, and it is "this function that precludes a consumer from accessing tiers of cable programming not part of his subscription package." *General Instrument Corp. v. FCC*, 213 F.3d 724, 726 (D.C. Cir. 2000) (footnote omitted). Converter boxes also perform other tasks "unrelated to security." *Id*. For example, "converter boxes commonly include channel tuners and provide access to video programming guides." *Id.* Historically, because only the cable system operator could provide the conditional access (security) technology, suppliers unaffiliated with the cable operator were not able to offer consumers comparable navigation devices. Hence, such devices were not available at retail.

In 1996, Congress amended the Communications Act to add a new section 629, entitled "Competitive Availability of Navigation Devices." 47 U.S.C. § 549. The first sentence of section 629(a) directs the FCC to "adopt regulations to assure the commercial availability, to consumers of multichannel video programming[,] . . . of converter boxes, interactive communications equipment, and other equipment used by consumers to access multichannel video programming[,] . . . from manufacturers, retailers, and other vendors not affiliated with any [MVPD]." *Id.* § 549(a). Section 629(a)'s second sentence further provides that "[s]uch regulations shall not prohibit any [MVPD] from also offering converter boxes, interactive communications equipment, and other equipment used by consumers to access multichannel video programming . . . ." *Id*.

In 1998, pursuant to section 629(a)'s directive to assure the commercial availability of navigation devices, the FCC adopted regulations that required MVPDs, by July 1, 2000, to make the security element available separately from the basic navigation

device. *See Implementation of Section 304 of the Telecommunications Act of 1996: Commercial Availability of Navigation Devices*, 13 FCC Rcd 14775, 14806, ¶ 76 (1998) ("*1998 Order*").[1] The FCC's *1998 Order* concluded that requiring MVPDs to make the security element separately available would permit independent manufacturers and retailers to market navigation devices while allowing MVPDs to retain control over their system security. *See* 13 FCC Rcd at 14793-94, ¶ 49. Thereafter, MVPDs began developing a separate security module -- now commonly referred to as a CableCARD -- that plugs into a slot in a host navigation device, permitting the device to perform both the security and non-security functions.

The *1998 Order* further required MVPDs, as of January 1, 2005, to stop selling or leasing new integrated navigation devices that perform both security and non-security functions.[2] After the effective date, the rule would preclude cable operators from offering subscribers the integrated set-top converter boxes that had previously been standard. Should MVPDs wish to continue selling or leasing converter boxes to subscribers after the effective date, the FCC required that those boxes be non-integrated and rely on the same technology -- the CableCARD -- available to independent manufacturers and retailers. The Commission determined that, even with an unbundled security

---

[1] *See* 47 C.F.R. § 76.1204(a)(1) ("A[n] [MVPD] that utilizes navigation devices to perform conditional access functions shall make available equipment that incorporates only the conditional access functions of such devices.").

[2] *See* 47 C.F.R. § 76.1204(a)(1) (1998) ("Commencing on January 1, 2005, no multichannel video programming distributor subject to this section shall place in service new navigation devices for sale, lease, or use that perform both conditional access and other functions in a single integrated device.").

element available from MVPDs, the continued availability of integrated devices -- devices that only MVPDs could provide -- would impede competition. *See id.* at 14803, ¶ 69.

Finally, the *1998 Order* provided that an MVPD could qualify for an exemption from the regulations if it "supports the active use by subscribers of navigation devices that: (i) operate throughout the continental United States, and (ii) are available from retail outlets . . . throughout the United States that are not affiliated with the [MVPD]." 47 C.F.R. § 76.1204(a)(2). In 1998, the only MVPDs that qualified for this exemption were direct broadcast satellite (DBS) systems. By contrast to the cable market, where navigation devices were unavailable except through cable operators, in the DBS market integrated navigation devices were already available at retail. In addition, although the DBS devices were not interchangeable among DBS providers, each DBS provider had a nationwide service footprint. Thus, unlike cable subscribers, DBS subscribers could continue using their equipment if they moved across the country, as long as they used the same DBS service provider. *See 1998 Order*, 13 FCC Rcd at 14800-02, ¶¶ 64-66.

The cable industry's trade association, the National Cable Television Association, Inc. (NCTA), challenged the *1998 Order* as well as a *1999 Reconsideration Order*[3] in *General Instrument Corp. v. FCC*, 213 F.3d 724 (D.C. Cir. 2000).[4]

---

[3]*See Implementation of Section 304 of the Telecommunications Act of 1996: Commercial Availability of Navigation Devices*, 14 FCC Rcd 7596 (1999) ("*1999 Reconsideration Order*").

[4]NCTA intervened on behalf of petitioner General Instrument Corp. in the 2000 challenge and intervenes on behalf of petitioners Charter Communications and Advance/Newhouse Communications here.

NCTA argued that the plain language of section 629(a) precludes the FCC from adopting the ban on integrated equipment. As NCTA noted, although the section's first sentence directs the FCC to adopt regulations to assure the commercial availability of "converter boxes, interactive communications equipment, and other equipment" from unaffiliated manufacturers and retailers, its second sentence directs that the regulations "shall not prohibit any [MVPD] from also offering converter boxes, interactive communications equipment, and other equipment." 47 U.S.C. § 549(a). NCTA maintained that the FCC had contravened the plain text of the second sentence by prohibiting cable operators from offering integrated converter boxes.

The *General Instrument* court rejected NCTA's statutory challenge, noting that the term "converter boxes" must be read consistently in both sentences. *See* 213 F.3d at 730. If we accepted NCTA's reading, we said, the FCC would be "equally compelled by the plain language of the statute to permit *retailers* to provide integrated" converter boxes. That, we noted, would "certainly [be] an unacceptable result from [the cable industry's] point of view," because it would give unaffiliated companies access to cable operators' proprietary security technology. *Id*. Instead, we accepted as reasonable the FCC's interpretation, which construed the term "converter boxes" as not including *integrated* converter boxes. *See id.*

In September 2000, with its statutory authority confirmed, the FCC issued a *Further Notice of Proposed Rulemaking* "to review the effectiveness" of its navigation device rules. *Implementation of Section 304 of the Telecommunications Act of 1996: Commercial Availability of Navigation Devices*, 15 FCC Rcd 18199, 18199, ¶ 1 (2000) ("*Further Notice*"). The *Further Notice* sought comment on the existence of "obstacles or barriers preventing or deterring the development of a retail

market for navigation devices," on the "effect operator provision of integrated equipment has had on achieving a competitive market for commercially available navigation devices," and on "whether the 2005 date for the phase-out of integrated boxes remains appropriate." *Id*. at 18203, ¶ 11. Before the FCC could act on the *Further Notice*, however, the cable and consumer electronics industries adopted a memorandum of understanding to integrate the non-security navigation functionality of set-top boxes directly into digital television sets. This innovation made it possible for customers simply to "plug and play" by inserting a CableCARD directly into a digital cable-ready television with no need for an external navigation device.[5] In April 2003, in part because of this development, the FCC extended the implementation date for the ban on new integrated boxes from January 1, 2005, to July 1, 2006. *See Implementation of Section 304 of the Telecommunications Act of 1996: Commercial Availability of Navigation Devices*, 18 FCC Rcd 7924, 7925-26, ¶ 4 (2003) ("*Extension Order*"). The *Extension Order* sought additional comments from industry and promised that, by 2005, the FCC would complete a reassessment of the state of the navigation device market and "determine whether the designated time frame remains appropriate or whether the ban on integrated devices will no longer be necessary." *Id*. at 7926, ¶ 5.

Both the cable and the consumer electronics industries filed voluminous comments in response to the *Further Notice* and the *Extension Order*. Cable commenters argued that changes in market conditions since the FCC adopted the integration ban warranted its repeal. By contrast, the consumer electronics

---

[5]The FCC subsequently adopted rules implementing the plug and play memorandum. *See Implementation of Section 304 of the Telecommunications Act of 1996: Commercial Availability of Navigation Devices and Compatibility Between Cable Systems and Consumer Electronics Equipment*, 18 FCC Rcd 20885 (2003).

industry denied that conditions had materially changed and opposed both repeal of the pending ban and any further extensions of the implementation deadline.

On March 17, 2005, the FCC issued its *Second Report and Order*. *See Implementation of Section 304 of the Telecommunications Act of 1996: Commercial Availability of Navigation Devices*, 20 FCC Rcd 6794 (2005) ("*Second Report and Order*"). While acknowledging some market progress, the FCC was "not persuaded that the current level of competition in the navigation device market is sufficient to assure the commercial availability of navigation devices to consumers from sources other than" MVPDs. *Id*. at 6794, ¶ 2. It concluded that the ban on integrated devices should be retained because "common reliance by cable operators on the same security technology and conditional access interface that consumer electronics manufacturers must employ in developing competitive navigation devices" was necessary to assure development of the statutorily required competitive market for navigation devices. *Id*.

The FCC did, however, extend the implementation date for the ban yet again, this time until July 1, 2007. *See id.* at 6811, ¶ 33. That extension, the FCC said, would provide the industry time in which to determine whether it was possible to implement a downloadable software security solution that would obviate the need for the physical integration ban. *See id.* at 6794-95, ¶ 3. The FCC further stated that, if the parties demonstrated that downloadable security was feasible but could not be implemented by July 1, 2007, it would consider granting still another extension. *See id.* at 6812-13, ¶ 36. The FCC instructed the cable industry to report on the feasibility of this solution by December 1, 2005, and instructed the trade associations for both the cable and consumer electronics industries to file joint status reports regarding their progress. *See id.* at 6795, ¶ 3.

Cable operators Charter Communications, Inc. and Advance/Newhouse Communications, joined by intervenor NCTA, now petition for review of the *Second Report and Order*. They argue that: (1) the integration ban violates the plain language of section 629(a); and (2) the FCC unreasonably declined to rescind the ban notwithstanding changed market conditions. We consider these arguments below.

II

We begin with the petitioners' statutory argument, which is essentially a spin-off of the argument addressed by this court in *General Instrument*. There, we rejected NCTA's contention that the FCC was precluded from banning integrated converter boxes by the second sentence of section 629(a), which states that the FCC "shall not prohibit any [MVPD] from also offering converter boxes, interactive communications equipment, and other equipment used by consumers to access multichannel video programming . . . ." 47 U.S.C. § 549(a). As discussed in Part I above, in order to reconcile the use of the term "converter boxes" in both the first and the second sentences of the section, we accepted as permissible the FCC's view that the term did not extend to *integrated* converter boxes. *General Instrument*, 213 F.3d at 730.

The petitioners now ask us to focus our attention not on the term "converter boxes," but on the term "other equipment." The petitioners argue that if integrated set-top boxes are not "converter boxes," as we held in *General Instrument*, then they must be "other equipment," a possibility we did not address there. And if integrated boxes are "other equipment," then section 629(a)'s second sentence prevents the FCC from barring cable operators from offering them. In response, the FCC's brief in this court points out that, like the term "converter boxes," the term "other equipment" appears in both sentences of

section 629(a). And just as *General Instrument* held that "'converter boxes' does not have to mean *all* converter boxes, 'other equipment used by consumers' does not need to mean *all* other equipment used by consumers." FCC Br. 22.

Before we may address the merits of the petitioners' statutory argument, we must first consider a potential show-stopper offered by the FCC. According to the Commission, two considerations bar us from even reaching the petitioners' statutory argument.

First, the Commission argues that the petitioners' statutory challenge is time-barred. According to the FCC, the integration ban was based on an interpretation of section 629(a) that was adopted in the *1998 Order* and *1999 Reconsideration Order*. Congress has required that petitions for review of such orders be filed within 60 days, 28 U.S.C. § 2344; *see* 47 U.S.C. § 402(a), and a petitioner's failure to file within that window constitutes a bar to our review. *See Natural Res. Def. Council v. Nuclear Regulatory Comm'n*, 666 F.2d 595, 602 (D.C. Cir. 1981). There is an exception to that bar for cases in which the FCC has "reopened" its original rulemaking, *see Kennecott Utah Copper Corp. v. United States Dep't of Interior*, 88 F.3d 1191, 1214 (D.C. Cir. 1996), and the petitioners claim that this case falls within that exception. They contend that, when the FCC issued its *Further Notice* "to review the effectiveness of the rules," 15 FCC Rcd at 18199, ¶ 1, and subsequently said that it would "complete a reassessment of the state of the navigation devices market and determine whether . . . the ban on integrated devices will no longer be necessary," *Extension Order*, 18 FCC Rcd 7926, ¶ 5, it reopened the question of its statutory authority to adopt the rules in the first place.

But nothing in those notices suggested that, in reviewing the "effectiveness" of the rules, the FCC intended to review their

statutory basis as well. There was not one word about the proper interpretation of section 629(a) in the notices. And there is not one word about the proper interpretation -- let alone the construction the petitioners suggest here -- in the *Second Report and Order* that is the subject of this case. Although the petitioners cite our decision in *Public Citizen v. Nuclear Regulatory Comm'n*, 901 F.2d 147 (D.C. Cir. 1990), in support of their reopening argument, the petitioners "misread *Public Citizen* to stand for the proposition that the substantive invalidity of a previously adopted regulation can always be asserted upon review of a later rulemaking on the same general subject even though the statutory time period for review has expired." *Kennecott*, 88 F.3d at 1214. "To the contrary, we expressly stated in [*Public Citizen*] that the appropriate way in which to challenge a longstanding regulation on the ground that it is 'violative of statute' is ordinarily 'by filing a petition for amendment or rescission of the agency's regulations, and challenging the denial of that petition.'" *Id*. (quoting *Public Citizen*, 901 F.2d at 152). Indeed, it is "absurd to suppose that every time an agency requests parties to compare the regulatory status quo with specific proposed alternatives, all facets of the status quo become fair game for new challenges." *Safe Food and Fertilizer v. EPA*, 350 F.3d 1263, 1267 (D.C. Cir. 2003); *see Cellular Telecomms. & Internet Ass'n v. FCC*, 330 F.3d 502, 508 (D.C. Cir. 2003) (holding that the 60-day window barred the petitioners from challenging the statutory authority underlying the FCC's 1996 decision to impose wireless number portability in a 2001 forbearance petition).[6]

---

[6]In *Public Citizen*, we said that, "[i]f in proposing a rule the agency uses language that can reasonably be read as an invitation to comment on portions the agency does not explicitly propose to change, or if in responding to comments the agency uses language that shows that it did in fact reconsider an issue, a renewed challenge to the underlying rule or policy will be allowed." 901 F.2d at 150. Here, the

Moreover, even if our review were not barred by the limited statutory window for filing petitions for review, it is certainly barred -- as the FCC also points out -- by 47 U.S.C. § 405, which requires that the Commission be afforded an "opportunity to pass" on an issue as a "condition precedent to judicial review." 47 U.S.C. § 405(a). This circuit has strictly applied that section, holding that we may not consider "arguments that have not first been presented to the Commission." *BDPCS, Inc. v. FCC*, 351 F.3d 1177, 1182 (D.C. Cir. 2003).[7] As the petitioners concede, there is not a single page in the voluminous record below in which they made the "other equipment" argument that they now press before this court. *See* Oral Arg. Tr. 6.

Notwithstanding their failure to raise this argument below, the petitioners urge us to reach it because they raised it in their original attack on the FCC's *1999 Reconsideration Order* -- an order that we upheld in *General Instrument*. According to the petitioners, the *General Instrument* court misunderstood the nature of their statutory argument, and thus addressed only the "converter box" language in that opinion. This, they say, left the "other equipment" language fair game for this appeal.

But even if the petitioners did raise this issue in the 1999 proceedings -- an assertion for which they provide no citation --

---

FCC neither invited comment on the statutory authority supporting the integration ban, nor did it respond to comments in a way that suggested it did in fact reconsider the issue. Indeed, as noted below, there were no comments on the statutory issue.

[7]*See, e.g., American Family Ass'n, Inc. v. FCC*, 365 F.3d 1156, 1166 (D.C. Cir. 2004); *Sioux Valley Rural Television, Inc. v. FCC*, 349 F.3d 667, 676 (D.C. Cir. 2003); *New England Pub. Commc'ns Council, Inc. v. FCC*, 334 F.3d 69, 79 (D.C. Cir. 2003); *Time Warner Entm't Co. v. FCC*, 144 F.3d 75, 81 (D.C. Cir. 1998).

"we see no reason the Commission should be required to sift through pleadings in other proceedings in search of issues that a petitioner raised elsewhere and might have raised here had it thought to do so." *Beehive Tel. Co., Inc. v. FCC*, 179 F.3d 941, 945 (D.C. Cir. 1999). "[I]ndeed, such a duty would be inconsistent with our adversarial system, in which the petitioner 'has the burden of clarifying its position before the agency.'" *Id.* (quoting *Bartholdi Cable Co. v. FCC*, 114 F.3d 274, 280 (D.C. Cir. 1997)). Nor would "a reasonable Commission *necessarily* . . . have seen the question raised before us as part of the case presented to it." *Time Warner Entm't Co. v. FCC*, 144 F.3d 75, 81 (D.C. Cir. 1998). To the contrary, our affirmation of the FCC's statutory authority in *General Instrument*, as well as the FCC's understanding that it had not reopened the issue, surely gave the Commission no reason to believe that the petitioners meant to reassert a statutory argument on this go-round. And that -- together with the petitioners' failure to mention the point at all -- certainly explains why the FCC did not address the question in the *Second Report and Order*. Accordingly, we are barred from considering the petitioners' statutory argument.

III

The petitioners also contend that the FCC unreasonably refused to rescind the integration ban in light of changed circumstances. This contention was raised below, and it is therefore properly before us. The petitioners regard the ban as unreasonable for an array of interrelated reasons. In considering those arguments, "we apply the deferential standard of the Administrative Procedure Act (APA), and will uphold the Commission's policy judgments as long as they are not 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Global Crossing Telecomms., Inc. v. FCC*, 259 F.3d 740, 745 (D.C. Cir. 2001) (quoting 5 U.S.C. § 706(2)(A)). Under that standard, the scope of review "'is

narrow and a court is not to substitute its judgment for that of the agency.'" *Cellular Telecomms.*, 330 F.3d at 507 (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). The agency must, however, "examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43 (internal quotation marks and citation omitted).

A

The petitioners' first argument is that the integration ban is no longer needed to comply with the statutory directive of section 629(a) because navigation devices are already available to consumers in the retail market. According to the petitioners, in the period since the rule was promulgated, "the cable and [consumer electronics] industries engaged in an extraordinary collaborative undertaking to bring CableCARD-equipped navigation devices to the retail market, and to implement the 'separate security requirement' of the *1998 Order*." Petitioners' Br. 21. In addition, the FCC's "plug and play" rules "legally bound the cable industry to specific technical and operational commitments to facilitate the commercial availability of digital cable-ready equipment." *Id.*; *see supra* note 5. As a result, by mid-2004, "the record showed the commercial availability of more than 140 models of CableCARD-compatible navigation devices from 11 different" manufacturers. *Id.* The "momentum and trajectory," the petitioners assure us, "is inexorably toward such availability regardless of any integration ban." Petitioners' Reply Br. 18.

The FCC did not ignore the developments cited by the petitioners, but its assessment both of the current state of the market and of its trajectory differed from that of the cable industry. Although the FCC agreed that there had been

progress, it was "clear from the record that the market for equipment used in conjunction with the distribution of digital cable video programming presently remains a nascent market." *Second Report and Order*, 20 FCC Rcd 6808, ¶ 28.[8] And whatever number of CableCARD-compatible television models might be available, the record reflected that less than three percent of the compatible televisions sold to consumers were actually being used with CableCARDs.[9] Citing submissions from the consumer electronics industry, the FCC also expressed "concern[] about evidence that cable operators are not adequately supporting CableCARDS." *Id*. at ¶ 27.[10] Given this record, there was nothing unreasonable about the FCC's conclusion that "the competitive reasons that led the

---

[8]Citing, inter alia, the cable industry's own comments, the FCC also found that an industry initiative to support the retail availability of integrated converter boxes "has not been successful." *Second Report and Order*, 20 FCC Rcd at 6799, ¶ 14; *see id.* at n.42 (citing NCTA comments acknowledging that the results of the initiative have been "disappointing").

[9]*See* Letter from Julie M. Kearney, Consumer Electronics Ass'n, to FCC Secretary (March 14, 2005) (stating that CableCARDs have been installed in "no more than 2.7% of the devices capable of receiving them") (J.A. 420); Comments of the Consumer Electronics Ass'n on NCTA Downloadable Security Report, CS Docket 97-80, at 3 (January 20, 2006) (noting that "80,000 CableCARDs have been provided for a total of 3.8 million TV receivers capable of relying on the CableCARDs -- barely 2 percent") (J.A. 313).

[10]*See* Letter from Lawrence Sidman to FCC Secretary (October 28, 2004) (detailing reports from consumer electronics manufacturers that consumers were experiencing "numerous technical implementation problems" including "persistent problems with CableCARDs or their headend support, erroneous software or firmware fixes, [and] inability of authorized subscribers to acquire some channels that offer encrypted content") (J.A. 534).

Commission to impose the integration ban have not been eliminated by the developments in the market." *Second Report and Order*, 20 FCC Rcd at 6809, ¶ 28.

Moreover, this court is bound to defer to the FCC's predictive judgment that, "[a]bsent common reliance on an identical security function, we do not foresee the market developing in a manner consistent with our statutory obligation." *Id*. at 6813, ¶ 36; *see Melcher v. FCC*, 134 F.3d 1143, 1151-52 (D.C. Cir. 1998) (noting that this circuit's review has been "particularly deferential" where the "FCC must make judgments about future market behavior with respect to a brand-new technology"). As the FCC explained: "At the heart of a robust retail market for navigation devices is the reliance of cable operators on the same security technology and conditional access interface that consumer electronics manufacturers must rely on in developing competitive navigation devices." *Second Report and Order*, 20 FCC Rcd at 6807, ¶ 27. If cable operators "must take steps to support their own compliant equipment, it seems far more likely that they will continue to support and take into account the need to support services that will work with independently supplied and purchased equipment." *Id*. at 6809, ¶ 30. This explains the FCC's "prohibition on integrated devices," as it "assur[es] that MVPDs devote both their technical and business energies towards creation of an environment in which competitive markets will develop." *Id*. It is an explanation that is neither arbitrary nor capricious.

B

The petitioners' second contention is that the FCC failed to explain adequately why the costs of the integration ban were justified. The cable industry maintains that the costs of re-engineering converter boxes will be "enormous," and that these costs will be passed on to subscribers who will obtain

"absolutely no benefit." Petitioners' Br. 27-28. Quoting a line from *General Instrument*, the petitioners declare that "[p]erhaps there are benefits that will flow to consumers from the integration ban, but the Commission did not clearly spell them out." 213 F.3d at 732.

The quotation from *General Instrument* provides no succor for the petitioners. Our reference there was to the *1998 Order*, not to the one we consider here, and we find the explanation offered in the *Second Report and Order* satisfactory. On the cost side, the agency noted that there was considerable dispute between the cable and consumer electronics industries regarding what those costs would actually be. *See* 20 FCC Rcd at 6809, ¶ 29. While the FCC did not dispute that "consumers will face additional costs in the short term," it "agree[d] with the [consumer electronics] parties and other commenters that the cost[s] . . . likely will decrease over time as volume usage increases." *Id*.; *see id.* at 6805, ¶ 24 (citing comments arguing that advances in technology, as well as volume production, will bring costs down, and that the costs described by NCTA are for first-generation products).[11] The Commission also took steps to minimize industry costs, both by extending the implementation deadline from 2006 to 2007, and by promising to reconsider eliminating the ban altogether should the cable and consumer electronics industries achieve a downloadable security solution capable of providing common reliance without requiring the physical separation of security and non-security functions. *See id.* at 6812-13, ¶ 36.

---

[11]*Cf. Consumer Elec. Ass'n v. FCC*, 347 F.3d 291, 303 (D.C. Cir. 2003) (holding that it was not unreasonable for the FCC to conclude, "on the basis of admittedly imperfect evidence and inherent uncertainty," that the cost of a new consumer electronics device "would likely fall" over time).

The FCC further concluded that the costs of the integration ban "should be counterbalanced to a significant extent by the benefits likely to flow from a more competitive and open supply market." *Id.* at 6809, ¶ 29. Those benefits included the "potential savings to consumers from greater choice among navigation devices," as well as the spurring of technological innovations. *Id*. And, of course, there was the fact that Congress regarded the commercial availability of navigation devices from independent sources as a benefit in and of itself. *See Consumer Elec. Ass'n v. FCC*, 347 F.3d 291, 303 (D.C. Cir. 2003) (indicating that the FCC had appropriately assessed, as a benefit of a regulatory requirement, the regulation's contribution toward speeding achievement of a congressional mandate). Given the congressional command "to assure" such availability, 47 U.S.C. § 549(a), and the FCC's determination that the integration ban was necessary to do so, we cannot regard the agency's cost-benefit balance as arbitrary. *See generally Consumer Elec. Ass'n*, 347 F.3d at 304 (noting that "'cost-benefit analyses epitomize the types of decisions that are most appropriately entrusted to the expertise of an agency'" (quoting *Office of Commc'n of United Church of Christ v. FCC*, 707 F.2d 1413, 1440 (D.C. Cir. 1983))).

C

Third, the petitioners object that the FCC "arbitrarily applied different decisional criteria in imposing the integration ban on cable but not DBS." Petitioners' Br. 29 (emphasis omitted). As we noted in Part I, the *1998 Order* provided that an MVPD could qualify for an exemption from the integration ban if it "supports the active use by its subscribers of navigation devices that: (i) operate throughout the continental United States, and (ii) are available from retail outlets . . . throughout the United States that are not affiliated with the [MVPD]." 47 C.F.R. § 76.1204(a)(2). At the time of the *1998 Order*, the FCC

concluded that only DBS systems qualified for the exemption. The petitioners contend that, by the time of the *Second Report and Order*, the cable industry had met the exemption requirements while DBS service was backsliding. Yet, they claim, the FCC "refused to even consider an exemption of cable -- whatever the evidence -- on the same grounds that the FCC" relied on to exempt DBS. Petitioners' Br. 30. This, they declare, was unfair to cable operators and put them at a competitive disadvantage.

It is simply not true that the FCC "refused to even consider" the petitioners' arguments, particularly as to disparate treatment. To the contrary, the Commission noted the petitioners' "concerns regarding the lack of parity in treatment between DBS operators and other MVPDs." *Second Report and Order*, 20 FCC Rcd at 6814, ¶ 38. But it also determined that "DBS equipment remains widely available at retail outlets from various DBS service providers and a number of different equipment manufacturers, on a geographically portable basis," and that "the distinctions that led the Commission to differentiate between DBS and other MVPDs in 1998 remain valid." *Id*.

Although the petitioners insist that more than 140 models of CableCARD-compatible navigation devices are commercially available, and that "all CableCARD-enabled devices are portable geographically *and* interoperable among cable systems," they concede that "the integrated set-top boxes cable operators lease to consumers are not geographically portable." Petitioners' Br. 36. And that is the rub, since the record reflects that less than three percent of CableCARD-compatible television sets are actually being used with CableCARDs. This means that the vast majority of cable subscribers remain dependent upon non-portable converter boxes available only from their cable companies. On these facts, it was not

unreasonable to doubt that the cable industry "supports the active use by its subscribers of navigation devices" that satisfy the two criteria required for exemption from the integration ban. 47 C.F.R. § 76.1204(a)(2).

The FCC also recognized the petitioners' point that "[a]voiding rule based market distortions with respect to DBS as a competitor to cable . . . is an important consideration." *Second Report and Order*, 20 FCC Rcd at 6814, ¶ 38. It did not, however, regard the present proceeding "as providing a record on which the Commission can resolve these issues." *Id*. The FCC's assessment of the state of the record appears correct. Indeed, while the petitioners claim that the ban places them at a serious competitive disadvantage vis-a-vis DBS, they concede that there is no quantitative evidence of such a disadvantage in the record. *See* Oral Arg. Tr. 8. The absence of a sufficient record is hardly surprising, since neither the *Further Notice* nor the *Extension Order* sought comment on the DBS exemption or on the relationship between developments in the DBS and cable markets. *See Further Notice*, 15 FCC Rcd at 18199, ¶ 1; *Extension Order*, 18 FCC Rcd at 7924, ¶ 3.

Under these circumstances, it was not unreasonable for the FCC to decline to resolve the DBS-related issues. As FCC counsel said at oral argument, the cable industry is "perfectly capable of filing a petition tomorrow with the Commission" that will generate a record appropriate for consideration of those issues. Oral Arg. Tr. 24. The FCC has discretion "to defer consideration of particular issues to future proceedings when it thinks that doing so would be conducive to the efficient dispatch of business and the ends of justice." *United States Telecom Ass'n v. FCC*, 359 F.3d 554, 588 (D.C. Cir. 2004). We perceive no abuse of that discretion here.

21

D

Fourth, the petitioners contend that the *Second Report and Order* failed to address the cable industry's argument that "vibrant intermodal competition has displaced any remaining justification for the integration ban." Petitioners' Br. 43. The "intermodal competition" they have in mind includes not only DBS services, but also "incumbent local telephone companies [that] are now entering the video market through multi-billion dollar construction of new fiber networks." *Id.* at 42. The petitioners' contention is that "intense competition from DBS [and others] in the marketing of video services to both current and potential cable customers . . . gives cable operators every incentive to maximize, rather than limit, the range of . . . equipment options and distribution outlets for equipment that enables consumers to access their services." *Id.* at 43 (internal quotation marks omitted).

The petitioners do not cite record evidence to support their depiction of the current state of intermodal competition as "vibrant" and "intense." But their larger problem is that, whatever the theoretical incentives, the FCC found that the real-world result that section 629(a) commanded it to assure -- the commercial availability of navigation devices from vendors unaffiliated with MVPDs -- has not arrived. The Commission determined that only "common reliance . . . on an identical security function [that] will align MVPDs' incentives with those of other industry participants" will achieve that result. *Second Report and Order*, 20 FCC Rcd at 6809, ¶ 30. As an example of the need for aligned incentives, the *Second Report and Order* recounted the cable industry's reluctance to provide TiVo -- an intermodal competitor -- with a multistream CableCARD: a device that TiVo needed to allow its customers to receive two streams of programming, but that cable did not need to provide the same service. *Id.* at 6803-04, ¶ 21 & n.88; *see* Oral Arg Tr.

at 26-27.[12]  Nothing about the petitioners' "intermodal" variant on the argument we considered in Part III.A calls into question the reasonableness of the FCC's conclusion that an integration ban remains necessary to achieve the statutory objective.

E

We next address the petitioners' charge that the Commission said "it would insist, now and in the future, upon an integration ban *regardless* of the extent of commercial availability of cable-ready navigation devices." Petitioners' Br. 41 (citing *Second Report and Order*, 20 FCC Rcd at 6812-13, ¶ 36).  That charge is simply not true.  The paragraph that the petitioners cite states that, "[a]lthough we agree with NCTA that the significant efforts by the cable and consumer electronics industries since 1998 indicate that a competitive environment sufficient to relax the prohibition on integrated equipment may develop, that day *has not yet* come." *Second Report and Order*, 20 FCC Rcd at 6812, ¶ 36 (emphasis added).  Far from saying it would never consider progress in commercial availability, the FCC said that, "[a]s part of the Commission's consideration of any further extensions, *we will consider* the extent to which there has been progress towards making navigation devices commercially available." *Id.* at 6813, ¶ 36 (emphasis added).

What apparently disturbs the petitioners is the paragraph's next sentence, in which the FCC advises that it is "not inclined" to grant any further extensions "on the basis of the level of

---

[12]TiVo is "an independently manufactured digital video recorder" that is "a direct competitor with digital video recorders that are supplied and now sold by the cable companies." Oral Arg. Tr. 26-27 (FCC counsel).  TiVo needed a multistream CableCARD to allow a customer to receive two streams of programming so that one could be recorded and the other watched. *Id.*

competition in the navigation device market" *because*, "[a]bsent common reliance on an identical security function, *we do not foresee the market developing* in a manner consistent with our statutory obligation." *Id.* (emphasis added). That is a predictive judgment that the FCC is entitled to make and to which we defer. *See Consumer Elec. Ass'n*, 347 F.3d at 303-04. Moreover, notwithstanding its doubts, the Commission "note[d] that Section 629 contains a sunset provision triggered by fully competitive markets for video programming and navigation devices," and that FCC "rules provide[] that any interested party may petition the Commission for a determination" that the sunset provision has been satisfied. *Second Report and Order*, 20 FCC Rcd at 6813, ¶ 36.[13]

At oral argument, the petitioners pointed to another place in the *Second Report and Order* -- footnote 142 -- that they also insist shows the FCC has plugged its ears against the cable industry's arguments. Oral Arg. Tr. 12-13. The second sentence of that footnote reads: "The Commission will not entertain arguments regarding the need for the cable industry to rely on the same security function as their consumer electronics competitors." 20 FCC Rcd at 6811 n.142. But while that sentence did foreclose the specified arguments, it did so only in a single forum. As the footnote's preceding sentence makes

---

[13]Section 629's sunset provision states that FCC "regulations adopted under this section shall cease to apply" when:

> the Commission determines that -- (1) the market for multichannel video distributors is fully competitive; (2) the market for converter boxes, and interactive communications equipment, used in conjunction with that service is fully competitive; and (3) elimination of the regulations would promote competition and the public interest.

47 U.S.C. § 549(e); *see* 47 C.F.R. § 76.1208.

clear, the edict of the sentence in question applied only to the "December 1, 2005 report by the cable industry and the comments in response" thereto. *Id.* Because the December 2005 report was "limited to . . . issues [relating to] the feasibility of a downloadable security function," *id.*, it was perfectly appropriate for the Commission to restrict that filing to those issues.

F

Finally, we note that the FCC's *Second Report and Order* extended the deadline for implementation of the integration ban in order to provide the cable and consumer electronics industries with more time to work toward the implementation of a new technology that may moot this entire controversy. The industries are currently developing the downloadable security system referenced above, which would "allow cable operators and consumer electronics manufacturers to rely on an identical security function, but would not require the potentially costly complete separation of the physical security element." 20 FCC Rcd at 6810, ¶ 31. In light of the evolving nature of that technology, it was hardly unreasonable for the FCC to delay, but not to delete, the integration ban. "Although the enforcement regime chosen by the Commission may not be the only one possible, we must uphold it as long as it is a reasonable means of implementing the statutory requirements." *Global Crossing Telecomms., Inc.*, 259 F.3d at 745. It is and we do.

IV

For the foregoing reasons, the petition for review is

*Denied.*