# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued April 8, 2008          Decided May 16, 2008

No. 07-1445

COMCAST CORPORATION,
PETITIONER

v.

FEDERAL COMMUNICATIONS COMMISSION AND UNITED
STATES OF AMERICA,
RESPONDENTS

———

NATIONAL CABLE & TELECOMMUNICATIONS ASSOCIATION
AND CONSUMER ELECTRONICS ASSOCIATION,
INTERVENORS

———

On Petition for Review of an Order
of the Federal Communications Commission

*David P. Murray* argued the cause and filed the briefs for petitioner.

*Raymond L. Gifford* and *Adam M. Peters* were on the brief for *amici curiae* Americans for Prosperity, et al. in support of petitioner.

*Matthew B. Berry*, General Counsel, Federal Communications Commission, argued the cause for respondents. With him on the brief were *Thomas O. Barnett*, Assistant Attorney General, U.S. Department of Justice, *Robert B. Nicholson* and *Robert J. Wiggers*, Attorneys, *Joseph R. Palmore*, Deputy General Counsel, Federal Communications Commission, *Richard K. Welch*, Acting Deputy Associate General Counsel, and *Laurence N. Bourne*, Counsel. *James J. Fredricks*, Attorney, U.S. Department of Justice, *Daniel M. Armstrong*, Associate General Counsel, Federal Communications Commission, and *Joel Marcus*, Counsel, entered appearances.

*Robert S. Schwartz* argued the cause for intervenor Consumer Electronics Association in support of respondents. With him on the brief were *Julie M. Kearney* and *Mitchell L. Stoltz*.

*Daniel L. Brenner* and *Neal M. Goldberg* were on the brief for intervenor National Cable & Telecommunications Association in support of respondents.

Before: GINSBURG and GRIFFITH, *Circuit Judges*, and SILBERMAN*, Senior Circuit Judge*.

Opinion for the Court filed by *Senior Circuit Judge* SILBERMAN.

SILBERMAN, *Senior Circuit Judge*: Petitioners, for the third time, challenge the FCC's policy regarding set-top converter boxes. We again deny their petition for review.

## I.

We have explained the origins of this dispute between Comcast and the Commission in *General Instrument Corp. v. FCC*, 213 F.3d 724, 727-30 (D.C. Cir. 2000) and *Charter Communications, Inc. v. FCC*, 460 F.3d 31, 34-37 (D.C. Cir. 2006). Briefly put, in order to access subscription video programming – such as cable service or direct broadcast satellite service – over their television sets, consumers generally require a set-top converter box. The converter box performs security functions – ensuring that only subscribers may access the programming – and may include other features such as channel tuners, program menus, pay-per-view, video-on-demand, video recording, and high-definition. Until recently, most consumers leased their converter boxes directly from the video provider; there was no competitive retail market for such devices.

Congress sought to force "unbundling" of the security and programming functions to create a competitive market for navigation (programming) devices in the Telecommunications Act of 1996. Section 629(a) of the Act instructed the FCC to "adopt regulations to assure the commercial availability . . . of converter boxes, interactive communications equipment, and other equipment used by consumers to access multichannel video programming . . . from manufacturers, retailers, and other vendors not affiliated with any [video provider]." 47 U.S.C. § 549(a). Pursuant to this statutory directive, in 1998 the Commission adopted rules requiring that the "security element" be made available separately from the basic navigation device. *Commercial Availability of Navigation Devices*, 13 F.C.C.R. 14,775, 14,793-94 (1998) ("*1998 Order*"). Video providers have complied with the Commission's rules by introducing the "CableCARD," which is a credit card-sized device that contains the video provider's security information. When this card is plugged into a set-top box, it enables the customer to access the

video programming and services to which he has subscribed. *See Charter*, 460 F.3d at 35.

The FCC further required that video providers stop selling or leasing integrated converter boxes (containing both security and navigation features) by January 1, 2005. *1998 Order*, 13 F.C.C.R. at 14,803. In other words, converter boxes supplied by video providers must rely upon the same security technology as the independently-produced boxes. We rejected various statutory challenges to this "integration ban" in *General Instrument*, 213 F.3d at 730-32.

In 2003, the FCC postponed the implementation date for the integration ban until July 1, 2006 and sought additional comments about the state of the market for navigation devices. The cable industry filed comments arguing that the integration ban was unnecessary and should be repealed. In 2005, the Commission denied the requests to repeal the ban, concluding that "common reliance by cable operators on the same security technology . . . that consumer electronics manufacturers must employ in developing competitive navigation devices will help attain the goals of Section 629 of the [Telecommunications] Act." *Commercial Availability of Navigation Devices*, 20 F.C.C.R. 6794 (2005) ("*2005 Order*"). Although it chose to retain the integration ban, the FCC again postponed the compliance date to July 1, 2007. The Commission also stated that it would be willing to entertain waiver requests for "low-cost, limited capability boxes" that do not include "personal video recording, high-definition, broadband Internet access, multiple tuner, or other similar advanced capabilities." *Id.* at 6813-14. The FCC determined that "provision of [limited-capability] devices by cable operators will not endanger the development of the competitive marketplace envisioned in Section 629, particularly because the more advanced devices offered by cable operators . . . will be required to rely on the

same [security] technology as devices offered at retail by consumer electronics manufacturers." *Id.*

In *Charter*, we rejected various challenges to the FCC's decision to retain the integration ban. 460 F.3d at 39-45. We held that the Commission reasonably concluded that "[i]f cable operators must take steps to support their own compliant equipment, it seems far more likely that they will continue to support and take into account the need to support services that will work with independently supplied and purchased equipment." *Id.* at 41 (citation and internal quotation marks omitted). We observed that even though the integration ban may impose short-term costs (*i.e.*, higher prices for non-integrated set-top boxes), the Commission reasonably explained why those costs were likely to be outweighed by the long-run benefits of a competitive equipment market, such as increased consumer choice and the spurring of technological innovation. *Id.* at 42.

\* \* \*

Pursuing what it thought was a regulatory opening under both section 629 and the Commission's "low-cost waiver" invitation in the *2005 Order*, Comcast sought a waiver of the integration ban for three models of set-top boxes. These are the lowest-cost boxes supplied by Comcast, but they still contain electronic programming guides, video-on-demand, pay-per-view, and interactive television capabilities. The FCC's Media Bureau denied the waiver request, holding that Comcast failed to meet the requirements for a waiver under the Telecommunications Act, the Commission's "low-cost, limited-capability" policy, or the Commission's general waiver authority. The full Commission affirmed the Media Bureau's denial of the waiver. *Comcast Corp.*, 22 F.C.C.R. 17,113 (2007) ("*2007 Order*"). Comcast has petitioned for review, arguing that the FCC's order was contrary to the Telecommunications

Act, and arbitrary and capricious as inconsistent with the Commission's prior actions and policies.

## II.

Comcast's primary argument is that it is entitled to a waiver under section 629(c) of the Telecommunications Act, which states in relevant part:

> The Commission shall waive a regulation adopted under subsection (a) of this section for a limited time upon an appropriate showing by a provider of multichannel video programming . . . that such waiver is necessary to assist the development or introduction of a new or improved multichannel video programming or other service offered over multichannel video programming systems, technology, or products.

47 U.S.C. § 549(c). Comcast argues that a waiver is "necessary to assist" the development of new digital services. Digital video services are more spectrum-efficient than analog services. Thus, when customers migrate from analog to digital, Comcast can reclaim the excess spectrum and use it for new or improved services. The converter boxes at issue here are the cheapest boxes that contain digital-to-analog converters, which enable viewers with analog TVs to view digital programming. It is contended that without a waiver for low-cost integrated boxes, the price of converter boxes will rise, fewer customers will make the transition to digital cable, and Comcast will not be able to roll out new digital services as quickly as it would be with a waiver.

The Commission concluded, however, that a waiver was not "necessary to assist the development or introduction" of new

services because Comcast already offered digital service in all of its markets and was likely to continue deploying new services even in the absence of a waiver. *2007 Order*, 22 F.C.C.R. at 17,119. The FCC also determined that granting the waiver would undermine common reliance, by reducing video providers' incentive to ensure that security elements are properly designed and supported for competitive equipment manufacturers. *Id.* at 17,118-19. Essentially, the Commission has concluded, or rather predicted, that to allow Comcast to introduce an integrated box that contains security, navigation, and programming features would inhibit the development of competitive navigation and programming devices. The Commission wishes to force Comcast to rely on the same security element as its competitors.

We think the FCC's explanation of why a waiver was not "necessary to assist the development or introduction" of new or improved video services was quite reasonable. Comcast currently offers digital video programming in all of its markets, and 45% of its customers are already digital subscribers. *Id.* at 17,119. The FCC relied in part upon Comcast's own press releases, which showed significant growth in revenue from digital services such as pay-per-view and video-on-demand. *Id.* Cable companies do not give away their services for free; as every cable customer knows, the more services and features you purchase, the higher your monthly bill will be. Thus, with or without a waiver, Comcast has a strong incentive to make as many services available as possible, and to continue introducing new high-value (and high-cost) features.

Comcast's argument in support of a waiver under section 629(c) primarily turns on cost concerns – the company argues that if non-integrated digital conversion boxes become more expensive, then fewer customers will migrate to digital cable. But from the start, the FCC has conceded that the integration

ban may impose short-term costs on cable companies and consumers. *2005 Order*, 20 F.C.C.R. at 6809. It reasoned, however, that those costs "should be counterbalanced to a significant extent by the benefits likely to flow from a more competitive and open supply market," such as lower prices, more choices, and the spurring of technological innovation. *Id.* We affirmed that determination in *Charter*, 460 F.3d at 42, and we may not revisit that conclusion here even if we wished to – which we do not.

In *Charter*, we also affirmed the FCC's decision to retain the integration ban, holding that:

> [T]his court is bound to defer to the FCC's predictive judgment that "[a]bsent common reliance on an identical security function, we do not foresee the market developing in a manner consistent with our statutory obligation." . . . If cable operators "must take steps to support their own compliant equipment, it seems far more likely that they will continue to support and take into account the need to support services that will work with independently supplied and purchased equipment."

*Id.* at 41 (citations omitted). Therefore, the Commission's continued emphasis on common reliance is hardly open to challenge.

## III.

Comcast alternatively argues that it is entitled to a waiver under the *2005 Order*, which the Commission now tells us (although it was not specific in 2005) was based on the Commission's general waiver authority, 47 C.F.R. § 1.3, rather

than on section 629(c).[1]  22 F.C.C.R. at 17,121, n.66.

The *2005 Order*, it will be recalled, stated that the Commission would "entertain" waiver requests for low-cost, limited-capability converter boxes that do not contain "personal video recording, high-definition, broadband Internet access, multiple tuner, or other similar advanced capabilities."  20 F.C.C.R. at 6813-14.  Comcast argues that the converter boxes at issue in this case are the lowest-cost, most-limited-capability digital boxes deployed by the cable industry, and thus they should be eligible for a waiver under the *2005 Order*.  In other words, Comcast wishes to fill a market niche for low-cost integrated boxes.

The FCC agreed with Comcast that the boxes in question are "low-cost," but it held that these boxes contain too many advanced features to be deemed "limited-capability."  *2007 Order*, 22 F.C.C.R. at 17,121-22.  For example, these boxes include electronic programming guides, pay-per-view, video-on-demand, and switched-digital capabilities.  The Commission determined that these features are "advanced capabilities," and thus held that Comcast was not eligible for a waiver under the low-cost, limited-capability waiver policy.

---

[1] Petitioners dispute this point, arguing that the *2005 Order* was based on section 629(c).  We would normally defer to an agency's interpretation of ambiguity in its own decisions, but it is unnecessary to decide this point since it really doesn't matter whether the Commission's *2005 Order* was based in whole or in part on section 629.  We have already rejected Comcast's arguments that it is entitled to a waiver under section 629.  Comcast also contends that, apart from the *2005 Order*, it is entitled to a waiver under the Commission's general authority to waive any of its rules "for good cause shown."  47 C.F.R. § 1.3.  But their contentions track those the Commission rejected under section 629(c).

The Commission's limited interpretation of its *2005 Order* was not unreasonable. The phrase "other similar advanced capabilities" is ambiguous, and the FCC's construction of this term is entitled to "substantial deference." *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994). In common parlance, "advanced" means "beyond the elementary or introductory" or "greatly developed beyond the initial stage." WEBSTER'S THIRD NEW INT'L DICTIONARY 30 (1964). Nor do we see any grounds to dispute the Commission's conclusion that interactive programming guides, pay-per-view, and video-on-demand are "advanced" services. These services are certainly close relatives of the functionalities that are specifically listed in the *2005 Order*, such as video recording, high-definition, and multiple tuners.

Moreover, the *2005 Order* did not reflect a binding commitment by the Commission to grant waivers to all low-cost devices. Rather, the Commission said only that it would "consider" such waiver requests based upon its "inclin[ation] to believe that provision of such devices . . . will not endanger the development of [a] competitive marketplace." 20 F.C.C.R. at 6813. In the order under review, the Commission pointed out that it "did not commit to automatically grant every waiver requested that purports to satisfy that objective." 22 F.C.C.R. at 17,121. It then concluded the waiver would harm competition, incorporating facts that were not before it in 2005. For instance, the boxes at issue make up a significant portion of the market and two-way integrated devices are not yet available at retail. In this sense, the denial of the waiver is easily reconcilable with the *2005 Order*.

Comcast asserts that during the *Charter* litigation, the Commission's counsel made representations to this Court that the FCC would grant Comcast's waiver request. That is not quite true. The Commission's counsel merely stated that the

FCC would be "favorably inclined" to grant waivers for "no-frills, simple digital set-top boxes." *Charter Communications v. FCC*, No 05-1237, Tr. of Oral Arg. at 21. Counsel mentioned that Comcast had applied for a waiver, but he did not suggest that the Commission was planning to grant that request.

\* \* \*

Finally, Comcast contends that the Commission's application of its waiver policy has been inconsistent.[2] Of course, an agency's unexplained departure from precedent must be overturned as arbitrary and capricious. *Pontchartrain Broad. Co., Inc. v. FCC*, 15 F.3d 183, 185 (D.C. Cir. 1994). Similarly, an agency must provide an adequate explanation to justify treating similarly situated parties differently. *Burlington N. & Santa Fe Ry. v. STB*, 403 F.3d 771, 776-77 (D.C. Cir. 2005). Comcast asserts that the Commission has acted inconsistently by denying its waiver request even though the FCC has granted waivers to several other video providers (some of which involved the exact same boxes at issue in this case).

If the earlier waivers had been granted by the Commission, Comcast would have a plausible argument. But the allegedly inconsistent waivers were all granted by the FCC's Media Bureau and were not appealed to the Commission. We have recently "reaffirmed our well-established view that an agency is not bound by the actions of its staff if the agency has not endorsed those actions." *Vernal Enters., Inc. v. FCC*, 355 F.3d 650, 660 (D.C. Cir. 2004). Comcast relies heavily upon

---

[2] The briefs filed by Comcast, the intervenors, and the amici make assertions bordering on accusations of the Commission's bad faith. We must presume an agency acts in good faith, *Thomas v. Baker*, 925 F.2d 1523, 1525 (D.C. Cir. 1991), but in any event we see no substance to these assertions.

*Northampton Media Associates v. FCC*, in which we suggested that decisions by a subordinate unit within an agency may constitute "agency policy." 941 F.2d 1214, 1216 (D.C. Cir. 1991). We have not overruled *Northampton* expressly, but a long line of cases in this circuit – both prior to and subsequent to *Northampton* – unambiguously holds that an agency is not bound by unchallenged staff decisions. As we stated in a recent case, "[t]here is no authority for the proposition that a lower component of a government agency may bind the decision making of the highest level." *Cmty. Care Foundation v. Thompson*, 318 F.3d 219, 227 (D.C. Cir. 2003); *see also Vernal Enters.*, 355 F.3d at 660; *Jelks v. FCC*, 146 F.3d 878, 881 (D.C. Cir. 1998) (per curiam); *Amor Family Broad. Group v. FCC*, 918 F.2d 960, 962 (D.C. Cir. 1991).

Comcast asserts that it had no incentive to challenge the waivers previously granted by the Media Bureau because it agreed with the Bureau's actions in those cases. But this is irrelevant. Without an appeal from the Media Bureau's decisions, we simply do not know how the Commission would have ruled on the earlier waiver requests. In the challenged order, the Commission emphasized that the previous Media Bureau orders "are not before us for review in this proceeding, and we accordingly express no opinion on the ultimate conclusions reached in those staff decisions." *2007 Order*, 22 F.C.C.R. at 17,127, n.99. If Comcast believes it will be at a competitive disadvantage against video providers who have received waivers, then it may petition the Commission to revoke the waivers that have been granted by the Media Bureau. *See* Respondent's Br. at 42, n.45; Tr. of Oral Arg. at 15-16. At that time, the FCC must either revoke the other waivers or offer a reasoned explanation for why it rejected Comcast's waiver but granted the others.

To be sure, Comcast is correct that in the absence of

Commission action to the contrary, the Media Bureau decisions have the force of law. 47 U.S.C. § 155(c)(3). But this simply means that those rulings are binding on the parties to the proceeding. As explained above, unchallenged staff decisions are not Commission precedent, and agency actions contrary to those decisions cannot be deemed arbitrary and capricious. Prior to Comcast's application for a waiver, the full Commission had not granted a waiver to any similarly situated entity. Thus, we reject Comcast's argument that the Commission's denial of its waiver request was discriminatory or inconsistent with prior FCC policies.[3]

## IV.

For the aforementioned reasons, the petition for review is denied.

*So ordered.*

---

[3] Even if inconsistency at the staff level were actionable, the Commission also argues that the waivers granted by the Media Bureau were consistent with the denial of Comcast's waiver request. *2007 Order*, 22 F.C.C.R. at 17,127, n.99. Comcast obviously disagrees. It is unnecessary to resolve this issue, because – as explained above – staff-level inconsistency does not render an agency action arbitrary and capricious.