# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued January 8, 2009         Decided April 28, 2009

No. 08-1066

EAGLE BROADCASTING GROUP, LTD.,
APPELLANT

v.

FEDERAL COMMUNICATIONS COMMISSION,
APPELLEE

Appeal of an Order of the Federal Communications
Commission

*Howard M. Weiss* argued the cause for appellant. With him on the briefs were *Peter Tannenwald* and *Davina S. Sashkin*.

*Daniel M. Armstrong*, Associate General Counsel, Federal Communications Commission, argued the cause for appellee. With him on the brief were *Matthew B. Berry*, General Counsel, *Joseph R. Palmore*, Deputy General Counsel, and *Pamela L. Smith*, Counsel.

Before: ROGERS and BROWN, *Circuit Judges*, and EDWARDS, *Senior Circuit Judge*.

Opinion for the Court filed by *Senior Circuit Judge* EDWARDS.

EDWARDS, *Senior Circuit Judge*: In 1996, Congress passed § 403 of the Telecommunications Act of 1996, Pub. L. No. 104-

104, 110 Stat. 56 ("the Telecommunications Act"), which amended the Communications Act of 1934, 47 U.S.C. § 151 *et seq.* ("the Act"). Section 403, as enacted in 1996, added a new subpart (g) to § 312 of the Act, providing in relevant part:

> If a broadcasting station fails to transmit broadcast signals for any consecutive 12-month period, then the station license granted for the operation of that broadcast station expires at the end of that period, notwithstanding any provision, term, or condition of the license to the contrary.

47 U.S.C. § 312(g) (1996). In 2004, after the occurrence of the events giving rise to this case, Congress added the following language to the provision:

> except that the Commission may extend or reinstate such station license if the holder of the station license prevails in an administrative or judicial appeal, the applicable law changes, or for any other reason to promote equity and fairness.

47 U.S.C. § 312(g) (2004).

At issue in this case is a decision by the Federal Communications Commission ("FCC" or "Commission") declaring that the broadcast license of Eagle Broadcasting Group, Ltd. ("Eagle") had expired pursuant to § 312(g). Eagle was licensed to operate radio station KVEZ(FM) from a site known as "Black Peak" (the "Black Peak site") but ceased broadcasting in June 2001 due to interference and land use issues. The FCC granted Eagle a temporary license to operate from its studio, but the station again went silent on December 20, 2002. Subsequently, Eagle applied to the Commission for a construction permit to broadcast from a new site in the Buckskin Mountains (the "Buckskin site"), but it failed to obtain the necessary clearance from the Federal Aviation Administration ("FAA") and the FCC. Eagle then failed for 12

consecutive months to resume broadcasting from its licensed site at Black Peak.

When the FCC determined that Eagle had not resumed broadcasting as of December 20, 2003, it declared that Eagle's license had expired pursuant to § 312(g). Eagle protested, arguing that its license had not expired because it had transmitted broadcast signals from the Buckskin site in November 2003. Eagle contended that it did not matter that its broadcast transmissions from the Buckskin site were unauthorized. The FCC rejected Eagle's petitions for reconsideration. Pointing to § 301 of the Act, the Commission noted that the Act clearly prohibits any person from transmitting broadcast signals except with a license granted by the Commission. The FCC therefore held that Eagle's unauthorized broadcasts from the Buckskin site were insufficient to avoid the strictures of § 312(g). *See Eagle Broadcasting Group, Ltd.*, 23 F.C.C.R. 588 (2008) [hereinafter, *Order*].

Eagle's principal argument on appeal is that the station did "transmit broadcast signals" within the meaning of § 312(g) before the one-year deadline. Eagle argues that Congress would have inserted the word "authorized" in the statute had it intended for the provision to be interpreted as the FCC has interpreted it in this case. According to Eagle, the plain language of the statute allows a station to transmit *any* signals from *any* location to avoid the automatic expiration of a license under § 312(g). We disagree. The FCC acted well within its statutory authority and pursuant to reasoned decisionmaking in rejecting Eagle's claim that unauthorized broadcasts by unlicensed stations are adequate to avoid license termination under § 312(g). And, contrary to Eagle's claims, the FCC's action was neither arbitrary and capricious nor an abuse of discretion.

## I. BACKGROUND

### A. *Statutory and Regulatory Background*

Section 301 of the Act bans any person from transmitting signals by radio "except under and in accordance with this chapter and with a license . . . granted under the provisions of this chapter." 47 U.S.C. § 301. The Act defines broadcasting as the "dissemination of radio communications intended to be received by the public." *Id*. at § 153(6).

Prior to the enactment of the Telecommunications Act, the Commission addressed "silent stations" – radio stations which were authorized to broadcast but were silent – in one of two ways. The FCC would either grant the station temporary authority to remain off the air if it found such a grant to be in the public interest, or it would initiate a revocation proceeding, which often included lengthy procedural requirements such as an evidentiary hearing. *See Implementation of Section 403(l) of the Telecommunications Act of 1996 (Silent Station Authorizations)*, 11 F.C.C.R. 16,599, 16,599 (1996) [hereinafter, *Silent Station Authorizations*].

In 1996, the Telecommunications Act added a new subsection to the Act, providing for the automatic expiration of a station's license when it failed to broadcast for 12 months. The new provision stated:

> If a broadcasting station fails to transmit broadcast signals for any consecutive 12-month period, then the station license granted for the operation of that broadcast station expires at the end of that period, notwithstanding any provision, term, or condition of the license to the contrary.

47 U.S.C. § 312(g) (1996). After the occurrence of the events giving rise to this case, Congress amended § 312(g) by adding language giving the Commission discretion to "extend or reinstate" a license in order to, *inter alia*, "promote equity and

5

fairness." *See* 47 U.S.C. § 312(g) (2004) (amended by Consolidated Appropriations Act, 2005, Pub. L. No. 108-447, 118 Stat. 2809 (2004)).

Because broadcast towers may interfere with air traffic safety, § 303(q) of the Act directs the Commission to mandate broadcast tower safety features, such as "painting and/or illuminination," when "there is a reasonable possibility" that a tower "may constitute . . . a menace to air navigation." 47 U.S.C. § 303(q). The Commission's rules provide that an applicant who proposes to construct a broadcast antenna with certain specifications must notify the FAA of the proposed construction. *See generally* Construction, Marking, and Lighting of Antenna Structures, 47 C.F.R. § 17.1, *et seq.* (2009). The rules make it clear that:

> (a) Effective July 1, 1996, the owner of any proposed or existing antenna structure that requires notice of proposed construction to the Federal Aviation Administration must register the structure with the Commission. . . .

> (b) . . . . [E]ach owner of a proposed structure . . . must submit a valid FAA determination of "no hazard."

> . . . .

> (d) If a final FAA determination of "no hazard" is not submitted along with FCC Form 854, processing of the registration may be delayed or disapproved.

*Id.* § 17.4.

## B. *Facts*

Through its owner, Maurice W. Coburn, Eagle acquired control of radio station KVEZ(FM) in 1995. KVEZ(FM) was licensed to operate from a site known as Black Peak in the community of Parker, Arizona, but ceased broadcasting from the site on June 23, 2001 due to interference and land use issues.

*See Order*, 23 F.C.C.R. at 589; Letter from Maurice W. Coburn to Secretary of FCC (June 5, 2002), *reprinted in* Joint Appendix ("J.A.") 145. On February 15, 2002, Eagle filed an application with the FCC for a construction permit to move to the Buckskin site. *See Order*, 23 F.C.C.R. at 589; Application for Construction Permit, J.A. 146.

On April 24, 2002, the Commission's staff (the "Staff") notified Eagle of a deficiency in the Buckskin site application. *Order*, 23 F.C.C.R. at 589. Eagle had failed to respond to a question that asked for a Commission tower registration number – a number an applicant receives after a FAA determination that the proposed broadcasting facility poses no hazards to air navigation. Because the Buckskin site is within the glide scope of air traffic using the Avi Suquilla Airport in Parker, Arizona, the FCC stated that FAA approval of the proposed tower was necessary. *Id.* at 594; FCC's Br. at 6. The Staff informed Eagle that "public safety factors required both FAA approval and Commission registration of the tower proposed in the Buckskin Application." *Order*, 23 F.C.C.R. at 589.

On June 5, 2002, instead of supplying the requested information, Eagle requested special temporary authority ("STA") to broadcast the signal of KVEZ(FM) from the station's studio in Parker, Arizona. Letter from Maurice W. Coburn to Secretary of FCC (June 5, 2002), J.A. 145. The request explained that the Black Peak broadcast site was no longer available due to interference and land use restrictions. Although a new site had been identified, approval would take more time than Eagle could afford under § 312(g)'s one-year silence deadline; thus, Eagle requested authority to temporarily broadcast from its studio location. *Id*. The Commission granted the STA on June 19, 2002, but reminded Eagle that, because the station had been silent since June 23, 2001, the license would expire as a matter of law if it did not resume broadcasting on or before June 23, 2002. Letter from Edward P. De La Hunt,

Associate Chief of FCC Audio Division, to Maurice W. Coburn (June 19, 2002)*, J.A. 142-43.

On July 10, 2002, Eagle notified the FCC that the station had "recommenced its regular broadcast under the [STA] granted by the [FCC]" and noted that "[a]s FCC files will indicate, KVEZ is awaiting approval of an alternate site, so that relocation construction can begin." Letter from Maurice W. Coburn to Edward P. De La Hunt (June 28, 2002), J.A. 141.

However, the STA expired on December 19, 2002, and on December 20, 2002, KVEZ(FM) again went silent. In a letter written that day, Eagle notified the FCC that the station was silent as of noon. The letter reported:

Our reason for going temporarily dark is that we are in the process of moving to our new transmitter site as previously approved by the F.C.C.

While we regret this brief period of darkness, it seems unavoidable under the circumstances. As your files will indicate, we were asked, after the F.C.C. had already cleared us to move, to obtain a [clearance] from the FAA (we had been under the impression that such a [clearance] would not be needed). While we filed our request promptly, it took the FAA several months to finally give its OK.

. . . .

We are proceeding with all deliberate speed to make the required upgrade to full power status, at the approved location, but we are requesting permission to remain dark for 30 to 60 days while all necessary construction and installations are completed.

Letter from Maurice W. Coburn to Edward P. De La Hunt (Dec. 20, 2002), J.A. 140.

On January 23, 2003, the Commission again requested that Eagle supplement the incomplete application for the Buckskin site. Letter from Rodolfo F. Bonacci, Supervisory Engineer of FCC Audio Division, to Eagle (Jan. 23, 2003), J.A. 138. Specifically, the letter requested that Eagle register the proposed antenna structure with the Commission, and reminded Eagle that FAA approval was "necessary in order to obtain FCC antenna structure registration." *Id*. The FCC advised that action on the application would be withheld until Eagle responded. Finally, it warned that Eagle's failure to respond would "result in the dismissal of the application" pursuant to a Commission rule which allows an application to be dismissed for failure to respond to an official request for additional information. *Id*. at 139; *see* 47 C.F.R. § 73.3568(a)(1).

Eagle still failed to respond with documentation of FAA approval. Instead, Eagle sent a series of letters to the FCC implying that FAA approval had either been obtained or was unnecessary. For example, on February 26, 2003, Eagle wrote another letter reporting on the "progress in moving KVEZ to its new approved site." Letter from Maurice W. Coburn to Edward P. De La Hunt (Feb. 26, 2003), J.A. 137. The letter noted: "As you will no doubt recall, after your office approved of our new transmitter-antenna site, it took several months to get clearance from the FAA and then LaPaz County. We are working with all due diligence to complete the move and installation." *Id*.

Additionally, on November 24, 2003, Eagle notified the FCC that the station had "completed its installation of a new transmitter and antenna at the previously approved site [n]orth of the city of license, Parker, Arizona." Letter from Maurice W. Coburn to Edward P. De La Hunt (Nov. 24, 2003), J.A. 136. The letter stated:

> We are pleased to inform the Commission that 15:30 hours on November 22, 2003, marked the resumption of regular broadcasting activities of KVEZ-FM in Parker, Arizona.

. . . .

The patience and assistance of your Staff throughout our many relocation problems is most appreciated.

*Id*.

And finally, on November 26, 2003, Eagle wrote to the Commission and stated that the FAA had informed Eagle that "since the station antenna site was not within the flight path of the Parker area airport, and not of significant height to either be lighted or painted with the orange/white pattern, that no special authorization was required." Email from Jerry Hale, Consultant to Eagle, to Rodolfo E. Bonacci, Supervisory Engineer of FCC Audio Division (Nov. 26, 2003), J.A. 134-35.

By reply sent on December 9, 2003, the Commission requested Eagle to submit a copy of the FAA's letter to "prove what you said below is correct," *i.e.*, that no FAA authorization was necessary. Email from Khoa Tran, FCC to Jerry Hale (Dec. 9, 2003), J.A.134. The letter also notified Eagle that, because the station had been silent since December 20, 2002, the "license is going to expire on 12/20/03." *Id*. Eagle's consultant responded the next day that he would "send a copy of the FAA information this week" and stated that "Mr. Coburn has notified the FCC in writing and by phone, as well as e-mail which I sent that KVEZ FM Parker, Arizona had returned to the air as of November 22, 2003." Email from Jerry Hale to Khoa Tran (Dec. 10, 2003), J.A. 134. The email requested that the FCC "verify that the Commission has received the appropriate notice so that the license will not expire on December 20. If we need to do any additional filings, please advise." *Id*.

Eagle never submitted any FAA letter or any documentation indicating that it had received "clearance" from the FAA with respect to the Buckskin site application. The Staff contacted the FAA on its own in June 2004 and was informed that the FAA "had no record of receiving any application or issuing any

determination for the site specified in the Buckskin Application." *Order*, 23 F.C.C.R. at 594 n.35. Rather, the FAA had only "provided an August 7, 2002 determination of no hazard to Eagle for a tower approximately 229 miles away from the Buckskin site." *Id*. at 594.

In early January 2004, the Staff received a complaint that station KVEZ(FM) was operating from a site the FCC had not approved. *Id*. at 590. On January 28, 2004, the Staff contacted the station for clarification. Email from Glenn Greisman, Industry Analyst for FCC Media Bureau-Audio Division, to Maurice W. Coburn (Jan. 28, 2004), J.A. 133. Eagle was instructed to provide the Commission with a file number to identify any "previously approved site." *Id*. Maurice Coburn and Eagle's consultant each telephoned the Staff to report that "the station was operating at the site proposed in the Buckskin application." *Order*, 23 F.C.C.R. at 590.

The FCC concluded that Eagle had not transmitted from its place of license – the Black Peak site – for over one year. Although Eagle represented that it was once again broadcasting, it was indisputably operating from an unauthorized and unlicensed facility. The Buckskin site application remained pending and Eagle had no authority to transmit broadcast signals away from the Black Peak site. And Eagle had not received FAA approval for operation of a broadcast tower at the Buckskin site. On February 17, 2004, the Staff informed Eagle that the pending Buckskin site application had been dismissed as moot and the call letters (the identifying code letters for the station assigned by the FCC) had been deleted because the underlying license for the Black Peak site had expired as a matter of law on December 21, 2003 pursuant to § 312(g). Letter from Peter H. Doyle, FCC Audio Division Chief, to Eagle (Feb. 17, 2004), J.A. 130 [hereinafter, Staff Decision]. The Staff Decision explained: "A broadcaster cannot avoid the statutory deadline set forth in § 312(g) by resuming operations,

as here, without an authorization, permanent or temporary, from the Commission." *Id.* at 131.

Eagle petitioned for reconsideration on March 18, 2004. Petition for Reconsideration ("Reconsideration Petition"), J.A. 113. Eagle subsequently filed a supplement to the Reconsideration Petition in light of Congress' amendment to § 312(g), noting that "[t]he statute, as amended, now directs the Commission to extend or reinstate broadcast licenses as appropriate 'to promote equity and fairness.'" Supplement to Petition for Reconsideration ("Supplement"), J.A. 24. The Reconsideration Petition, the Supplement, and two other petitions filed by Eagle requesting license renewal were referred to the Commission for review. *Order*, 23 F.C.C.R. at 588.

## C.   Order *on Appeal*

The Commission denied all four petitions. *Order*, 23 F.C.C.R. at 588. First, the Commission disagreed with Eagle's contention that "unauthorized transmissions are sufficient to avoid the consequences of § 312(g)." *Id.* at 592. The Commission explained:

> Section 301 . . . provides that no person shall transmit radio signals except in accordance with authority granted by the Commission. It further provides that no license shall be construed to create any right beyond the terms, conditions, and authority of the license. The sanctions set forth in Section 312 enforce these provisions. Section 312(g), which establishes the specific sanction for extended failure to broadcast, cannot be read to create an exception to Section 301 licensing requirements. Indeed, if read to permit unauthorized operation to avoid license expiration, Section 312(g) would encourage violation of Section 301 and defeat its own purpose of ensuring timely construction and operation of authorized facilities that serve the public.

*Id*. Thus, the Commission rejected Eagle's claim that its unauthorized transmissions from the Buckskin site were sufficient to avoid license termination.

The Commission also rejected Eagle's assertion that it reasonably believed the transmissions from the Buckskin site were authorized. *Id.* at 593. Eagle claimed that it believed the Staff had erroneously determined that FAA approval was required to construct the proposed tower at the Buckskin site, and that this "mistake" had been resolved. The Commission found that Eagle's claim of an innocent mistake was inconsistent with the facts. Noting the number of shifting theories Eagle had presented regarding the issuance of a FAA air hazard determination, the *Order* concluded that "Eagle's claim that it held an authorization to operate at Buckskin is frivolous." *Id*. at 594.

> Commission construction permits are written documents. The Commission never issued, and therefore Eagle never received, a construction permit or any other document establishing that the Buckskin application had been granted. To the contrary, as noted above, the staff advised Eagle in writing that the application could not be granted until Eagle supplied tower notification/registration information. Eagle's alleged belief that the application had been granted by the fall of 2003 is also inconsistent with its consultant's contacts with the staff in November and December 2003 to address the FAA-related deficiency that continued to prevent staff action. Eagle's *pro se* status at that time did not exempt it from complying with Commission rules or statutory provisions.

*Id*. at 594-95.

The *Order* also rejected Eagle's claim that, under FCC case precedent, Eagle should have been assessed a monetary forfeiture, in lieu of license expiration, for unauthorized

operations. The FCC distinguished the forfeiture cases cited by Eagle, saying that "Eagle fails to comprehend the critical differences between rule violations and Section 312(g)." *Id.* at 596. The Commission noted that it had "discretion to shape penalties for rule violations," and distinguished the forfeiture cases as inapplicable because "[t]hey do not address Section 312(g), focusing only on other rule violations." *Id.*

Finally, the Commission rejected Eagle's alternative request for discretionary license reinstatement under the amended § 312(g). *Id.* at 599-600. The Commission first noted that Eagle's license expired on December 21, 2003, before the 2004 legislation was enacted. The Commission then concluded that, in any event, Eagle had failed to qualify under the statute for license reinstatement. Eagle had not obtained permission to construct a tower or operate from the Buckskin site, and Eagle's claim that it was "confused" about the status of its permit was not credible. The Commission also noted that the Staff had warned Eagle about the risk of license expiration under § 312(g). The *Order* characterized Eagle's claim that it had resumed operations at an authorized site as "misleading" and "false." *Id.* at 601.

Eagle raises three central arguments on appeal. First, Eagle asserts that § 312(g), by its plain terms, only prescribes license expiration in cases of utter silence. Because it transmitted from the Buckskin site, Eagle claims that it cannot be said that it "fail[ed] to transmit broadcast signals" for a consecutive 12-month period. Second, Eagle argues that the FCC's action was arbitrary and capricious because the Commission imposed a monetary forfeiture, rather than license expiration, against other similarly situated licensees who operated unauthorized facilities for more than a 12-month consecutive period. Finally, Eagle argues that the FCC should have reinstated its license under the 2004 amendment to § 312(g), which vests the Commission with

discretion to reinstate a license that has expired if doing so would "promote equity and fairness." 47 U.S.C. § 312(g).

## II. ANALYSIS

### A. *Standard of Review*

In order to determine whether the Commission permissibly terminated Eagle's license pursuant to § 312(g), the court applies the familiar two-part test of *Chevron USA Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). "*Chevron* instructs us to accord agency interpretations of statutes they administer varying degrees of deference." *Nat'l Ass'n of Clean Air Agencies v. EPA*, 489 F.3d 1221, 1228 (D.C. Cir. 2007). Under *Chevron* Step One, the court examines the statute *de novo* in order to determine "whether Congress has directly spoken to the precise question at issue." *Chevron*, 467 U.S. at 842. If so, "that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Id.* at 842-43. However, "if Congress has [not] directly spoken to the precise question at issue," the Court moves on to *Chevron* Step Two. *Id*. at 842. Under Step Two, "[i]f Congress has explicitly left a gap for the agency to fill, there is an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation. Such legislative regulations are given controlling weight unless they are . . . manifestly contrary to the statute." *Id*. at 843-44. Where, on the other hand, the legislative delegation to the agency is "implicit rather than explicit," we will uphold any "reasonable interpretation made by the administrator" of the agency. *Id*. at 844.

Even when an agency's construction of its statute passes muster under *Chevron*, a party may claim that the disputed agency action is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

Section 706(2)(A) of the APA provides that a reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  This is the APA's "catch-all" provision governing the scope and standards of review, and the courts rarely draw any meaningful distinctions between acts that are "arbitrary, capricious, or an abuse of discretion."  *Block v. Pitney Bowes Inc.*, 952 F.2d 1450, 1454 (D.C. Cir. 1992).  "[A]rbitrary, capricious, [or] an abuse of discretion" review under § 706(2)(A) is now routinely applied by the courts as one standard under the heading of "arbitrary and capricious" review.  And it encompasses both review of the factual basis of an agency's action, *see Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971), and review of an agency's reasoning as distinguished from its factfinding, *see Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.*, 419 U.S. 281, 285-86 (1974).  Moreover, the arbitrary and capricious standard governs review of all proceedings that are subject to challenge under the APA.  *See Consumers Union of U.S., Inc. v. FTC*, 801 F.2d 417, 422 (D.C. Cir. 1986).  Thus, if an action is subject to review under the APA, it does not matter whether it is a formal or informal adjudication or a formal or informal rulemaking proceeding – all are subject to arbitrary and capricious review under § 706(2)(A).

HARRY T. EDWARDS & LINDA A. ELLIOTT, FEDERAL STANDARDS OF REVIEW – REVIEW OF DISTRICT COURT DECISIONS AND AGENCY ACTIONS 167 (2007).  "Normally, an agency [action]  would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it

could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (internal quotation marks and citation omitted). Additionally, "an agency may not treat like cases differently." *Freeman Eng'g Assocs., Inc. v. FCC*, 103 F.3d 169, 178 (D.C. Cir. 1997) (internal quotation marks and citation omitted). And "an agency's unexplained departure from precedent must be overturned as arbitrary and capricious." *Comcast Corp. v. FCC*, 526 F.3d 763, 769 (D.C. Cir. 2008).

As noted above, Eagle contends that the FCC "wrongly interpreted 47 U.S.C. § 312(g) to require authorized transmissions in order to avoid expiration of a licence." Eagle's Br. at 12. Eagle also argues that the FCC's action was arbitrary and capricious because the agency treated Eagle differently than other similarly situated licensees, *id.* at 22, and an abuse of discretion because Eagle's license should have been reinstated pursuant to the 2004 amendment to § 312(g), *id.* at 27. We find no merit in these claims.

## B. Chevron *Step One*

Eagle argues that the FCC's decision to cancel Eagle's license pursuant to § 312(g) should be invalidated under *Chevron* Step One, because it is at odds with the plain meaning of the statute. Under *Chevron* Step One, the court applies the traditional tools of statutory construction in order to discern whether Congress has spoken directly to the question at issue. *Chevron*, 467 U.S. at 842-43. If this "search for the plain meaning of the statute . . . . yields a clear result, then Congress has expressed its intention as to the question, and deference is not appropriate." *Bell Atlantic Tel. Cos. v. FCC*, 131 F.3d 1044, 1047 (D.C. Cir. 1997).

Eagle argues that § 312(g) only allows for license expiration in the case of utter silence. Eagle was required to resume

broadcasting within one year of December 20, 2002 – the date that it went silent – in order to avoid expiration under § 312(g). The station purported to "resume broadcasting" on November 22, 2003. Focusing on the statutory language "fails to transmit broadcast signals," Eagle first emphasizes that the Act defines broadcasting as "the dissemination of radio communications intended to be received by the public." 47 U.S.C. § 153(6). Eagle then argues that "[t]here is no question that [it] operated a radio transmitter and intended that its service be received by the public." Eagle's Br. at 9. Thus, according to Eagle, the FCC erred by reading a restriction into the statute that the broadcast must be an *authorized* transmission. Eagle asserts: "Had it intended to say what the FCC believes it intended, Congress could have easily inserted the word 'authorized' between 'transmit' and 'broadcast' in the statute." Eagle's Br. at 15. Eagle asks the court to interpret the omission of the word "authorized" as a signal that Congress intended *any* broadcast to count for the purposes of § 312(g).

There is no doubt that § 312(g) does not, by its plain terms, state that unauthorized transmissions are sufficient to avoid expiration pursuant to § 312(g). In other words, the statutory text "fails to transmit broadcast signals" surely does not *plainly* indicate that *unauthorized* and *unlicensed* broadcast transmissions are sufficient to avoid the strictures of § 312(g). The most that can be said is that § 312(g), standing alone, is silent with respect to whether transmissions must be authorized in order to avoid license expiration.

Actually, when § 312(g) is read in context, *i.e.*, as a part of the entire Act, Eagle's "plain meaning" argument falls apart. *See, e.g.*, *Sierra Club v. EPA*, 551 F.3d 1019, 1027 (D.C. Cir. 2008) (stating that the meaning of certain words and phrases must be examined in context as part of the *Chevron* Step One inquiry). Section 301 of the Act positively requires a purported broadcaster to secure a license from the FCC to transmit

broadcast signals by radio. 47 U.S.C. § 301. Unlicensed radio transmissions are not recognized under the Act. And nothing in § 312 says otherwise. It is therefore an understatement to say that it strains credulity to suggest that the reference to "broadcast signals" in § 312(g) includes *unauthorized* and *unlicensed* transmissions.

Moreover, Eagle conceded at oral argument that its reading of § 312(g) would allow a station to avoid expiration by broadcasting from any site, even one that is thousands of miles removed from the authorized location. Recording of Oral Argument at 8:08. In other words, according to Eagle, the company could have avoided license expiration by broadcasting from a site in New York. Section 312(g) cannot be read to plainly dictate this absurd result.

Section 312(g) refers only to broadcasters who have a "station license" to transmit radio signals. As the parties acknowledged at oral argument, Eagle's license was specifically limited to one permissible site of operation – Black Peak. When Eagle failed to transmit from this place of license for more than a year, its license expired by operation of law. Under the statute, unauthorized and unlicensed transmissions are no better than silence. If anything, the plain meaning of § 312(g) says just the opposite of what Eagle contends.

## C. Chevron *Step Two*

Even if we assume that § 312(g) does not admit of "plain meaning" in support of the FCC's construction, the agency's interpretation easily survives scrutiny under *Chevron* Step Two. When, as in this case, "the legislative delegation to an agency on a particular question is implicit rather than explicit . . . a court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency." *Chevron*, 467 U.S. at 844. We find the FCC's construction of § 312(g) eminently reasonable.

The FCC reasonably determined that § 312(g) must be read in conjunction with § 301. Section 301 makes clear that broadcast transmissions cannot occur except as authorized by a FCC license. Indeed, a license to broadcast is the "central requirement" of the Act. *Ruggiero v. FCC*, 317 F.3d 239, 245 (D.C. Cir. 2003). And § 312(g) creates no exception to § 301. Moreover, as noted above, a FCC license specifies both the licensee's site and bandwidth. An unauthorized transmission is neither condoned nor recognized by the Act. Rather, it is prohibited. Thus, in assessing a licensee's rights under § 312(g), the FCC reasonably concluded that an unauthorized transmission counts for nothing.

Eagle's contention that the FCC's position in this case is at odds with the Commission's 1996 order implementing § 312(g), *see Silent Station Authorizations*, 11 F.C.C.R. 16,599, is not persuasive. It is true that the implementing order does not mention the need to operate from *authorized* facilities to avoid the strictures of § 312(g). This proves nothing, however, because the requirement of authorized transmissions is clear from § 301.

Eagle quotes a portion of the implementing order that states: "[t]he 1996 Act is clear that the relevant period of the silence is that of the *station*. The period is not based on any particular licensee or facility." Eagle's Br. at 21 (quoting *Silent Station Authorizations*, 11 F.C.C.R. at 16,601). Eagle argues that this language suggests that the FCC's focus on the license status of its facilities has no place in a § 312(g) inquiry. But Eagle ignores the next sentence in the implementing order, which states:

> Accordingly, the assignment or transfer of a broadcast license, the modification of the licensed facilities, special temporary authorizations to remain silent (STAs), and other transactions will not toll or extend the 12-month period, notwithstanding any provision in any authorization to the

contrary. Neither can the Commission prevent the automatic expiration of the license by waiver.

*Silent Station Authorizations*, 11 F.C.C.R. at 16,601. Rather than suggesting that unauthorized transmissions were permissible, the implementing order emphasized that expirations under § 312(g) are mandatory and stressed that not even agency actions could toll the 12-month period.

In sum, the Commission's interpretation of § 312(g) easily passes muster under *Chevron* Step Two.

**D.** ***The Commission's Action Was Not Arbitrary and Capricious***

It is well understood that "an agency's unexplained departure from precedent must be overturned as arbitrary and capricious." *Comcast Corp.*, 526 F.3d at 769. Eagle argues that the Commission's disputed action in this case was arbitrary and capricious, because in other cases involving similar fact patterns the Commission imposed monetary forfeitures against licensees rather than declaring their licenses expired pursuant to § 312(g).

The Commission argues that the cases cited by Eagle are factually distinguishable, in part because most did not involve applications of § 312(g). In addition, all but one of the cases cited by Eagle were staff decisions and thus had no binding precedential effect. "[U]nchallenged staff decisions are not Commission precedent, and agency actions contrary to those decisions cannot be deemed arbitrary and capricious." *Id.* at 770.

Only one case cited by Eagle, *Maria L. Salazar*, 19 F.C.C.R. 5050 (2004), involves a decision of the Commission. *Salazar* is inapposite, however, because it did not involve the application or enforcement of § 312(g). Eagle argues that this "misses the point," because the Commission's failure to apply § 312(g) in *Salazar* was a *sub silentio* determination that

unauthorized transmissions are sufficient to avoid license expiration under § 312(g). Eagle's Br. at 25. We disagree.

In *Salazar*, the licensee was cited for a host of rule violations, including transmitting from an unauthorized site. However, the record does not indicate that the licensee failed to transmit authorized broadcasts over a stretch of 12 months. In fact, another order in the same case makes clear that the station in *Salazar* was simultaneously transmitting from two locations – one authorized and one unauthorized. *Maria L. Salazar, Notice of Apparent Liability*, 17 F.C.C.R. 14,090, 14,090-91 (2002). Because the station in *Salazar* never ceased transmitting from an authorized location, it was not silent, and the Commission's imposition of a money forfeiture in that case without a license revocation is in no way inconsistent with the action taken in this case.

**E.** **The Commission Did Not Abuse its Discretion in Refusing To Reinstate Eagle's License Under the 2004 Amendment to § 312(g)**

As noted above, the 2004 amendment to § 312(g) vests the Commission with discretion to reinstate a license that has expired if doing so would "promote equity and fairness." 47 U.S.C. § 312(g). Eagle contends that the Commission abused its discretion in declining to reinstate its license under the 2004 amendment to § 312(g). Assuming, *arguendo*, that the Commission was obliged to apply the 2004 version of § 312(g) when it considered Eagle's petition for reconsideration, we find no abuse of discretion.

Eagle claims that there were "mitigating circumstances" that should have caused the Commission to act favorably on its petition for reconsideration. In particular, Eagle cites its "misunderstanding" as to what it would take to obtain authorization for the Buckskin site, lack of counsel to assist in the processing of its applications, and "good faith" mistakes. In

Eagle's view, "What we have here is a failure of communication." Eagle's Br. at 30. We view the record quite differently.

The Commission determined that Eagle never received approval for the Buckskin site from the FAA or from the FCC. And the Commission found that Eagle never offered a convincing explanation to support its claim of a good faith belief that it was acting with authorization. In fact, Eagle's claim that it believed it had obtained a license for the Buckskin site and that the FAA approved the site appears to be disingenuous. As the Commission points out, "it does not require legal counsel or any level of sophistication to avoid making false statements on simple matters of fact (such as whether or not an FAA clearance letter existed that would be forwarded to the Commission later in the week)." FCC's Br. at 29. Moreover, the record makes clear that Eagle received a number of warnings from FCC Staff about the risk of expiration under § 312(g). Eagle had fair warning of the rules and had every reason to understand what was required of the company in order to avoid license expiration under § 312(g). In these circumstances, the Commission acted with justification and without abusing its discretion in denying Eagle's petition to reinstate its license.

## III. CONCLUSION

For the reasons stated above, we affirm the Commission's decision invoking § 312(g) to terminate the broadcasting license of Eagle Broadcasting Group, Ltd.